Thomas D. MALLETTE, Jr., et al.

v.

**CHILDREN'S FRIEND AND SERVICE.**

No. 94–96–M.P.

Supreme Court of Rhode Island.

June 30, 1995.

See also 661 A.2d 74.

Stephen P. Sheehan, Wistow & Barylick, Providence, for plaintiff.

Anthony E. Angeli, Jr., DCYF, Mark P. Dolan, Rice, Dolan & Kershaw, Providence, for defendant.

## OPINION

MURRAY, Justice.

This case comes before us on the petition of the defendant adoption agency Children's Friend and Service (CFS or the agency), for writ of certiorari. The agency contends that the trial justice erred in denying its motion to dismiss the plaintiffs' amended complaint. To the extent noted below, we affirm the trial justice.

This action arises out of the 1983 adoption of Christopher Mallette (Christopher) by the plaintiffs Thomas D. Mallette, Jr., and Deborah Mallette (the Mallettes). In 1981 the Mallettes sought to adopt a child through CFS. Shortly thereafter, in 1982, the Mallettes were informed by CFS that a child was available whom they might be interested in adopting. According to the Mallettes' amended complaint, at this time employees of CFS negligently misrepresented and omitted material information concerning Christopher's medical and family history.[1] Christopher, now thirteen years old, is mentally retarded and severely disturbed.

In an affidavit submitted in opposition to CFS's motion to dismiss, Deborah Mallette asserts that beginning in July 1991 she and her husband first began to learn the true state of the medical and genetic history of Christopher's biological family: Christopher's biological mother had been diagnosed as possessing macrocephaly, pseudoepicanthal folds, a high-arched palate, tachycardia, small clinodactyly of the fifth fingers, tremors of the hands, and poor coordination. It is

alleged that all these conditions were known by CFS prior to Christopher's adoption.

The affidavit also states that prior to the adoption, the Mallettes had been informed by CFS that Christopher's biological mother suffered from learning disabilities caused solely by head trauma as a young child. The Mallettes allege, however, that at the time of the adoption CFS possessed a document entitled "Medical History For Christopher Mallette" indicating that Christopher's biological mother had been diagnosed as mildly to moderately retarded with only a "possibility" that such retardation resulted from head trauma. The document candidly admitted that no medical documentation existed to support such a possible conclusion. The Mallettes also contend that the same document described Christopher's biological maternal grandmother as "intellectually limited." According to the Mallettes, CFS never disclosed this information prior to Christopher's adoption.

Following these revelations, the Mallettes instituted this action against CFS on December 3, 1991.[2] Their amended complaint specifically alleges that CFS was negligent in failing to provide information and records regarding Christopher's background, including his family and medical history; in misrepresenting information concerning Christopher's medical and family history; and in failing to inform them of Christopher's probable need for future treatment and care. As a consequence of the agency's alleged negligence, the Mallettes aver that they suffer great mental anguish and emotional distress, have incurred enormous expenses for medical and psychiatric treatment of Christopher, and have lost opportunities for proper medical and psychiatric treatment for Christopher.

The agency moved to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure on the ground that it failed to state a claim upon which relief could be granted. On February 1, 1994, the trial justice denied the motion

---

1. It appears that the Mallettes amended their original complaint when the trial justice expressed doubts that the complaint stated a claim for negligent misrepresentation.

2. Thomas and Deborah Mallette have instituted this action individually and as parents and next of friends of Christopher.

without much comment. The agency immediately filed a petition for writ of certiorari with this court, which we granted on April 29, 1994. The sole issue for our review is whether the Mallettes have stated a cause of action under Rhode Island law.[3]

Before reaching the merits of the instant case, we note that the trial justice apparently relied on matters outside the pleadings in rendering his decision, thereby converting the motion to dismiss into one for summary judgment. *See Ouimette v. Moran,* 541 A.2d 855 (R.I.1988) (if trial justice considers matters outside the scope of the complaint in reviewing a Rule 12(b)(6) motion, the motion is converted into one for summary judgment). As such our review of the trial justice's decision will proceed under well-settled principles governing summary judgment.

 A motion for summary judgment is a harsh remedy and must be applied cautiously. *Golderese v. Suburban Land Co.,* 590 A.2d 395 (R.I.1991). In ruling on a motion for summary judgment, the trial justice considers all pleadings, affidavits, and other appropriate evidence in the light most favorable to the opposing party. *Textron, Inc. v. Liberty Mutual Insurance Co.,* 639 A.2d 1358 (R.I.1994). The entry of summary judgment is appropriate if no material facts exist, and the moving party is entitled to judgment as a matter of law. *DiQuinzio v. Panciera Lease Co.,* 612 A.2d 40 (R.I.1992). With these principles in mind, we turn to the instant case.

American jurisprudence has begun only recently to recognize causes of action for "wrongful adoption." *See Burr v. Board of County Commissioners of Stark County,* 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) (recognizing a claim for intentional misrepresentation in the adoption context). Unfortunately, courts and commentators have injected some confusion into this area by employing the term "tort of wrongful adoption" to encompass a variety of distinct common law causes of action. *See, e.g., Juman v. Louise Wise Services,* 211 A.D.2d 446, 620 N.Y.S.2d 371

(1995) (fraud and misrepresentation); Note, *When Love Is Not Enough: Toward a Unified Wrongful Adoption Tort,* 105 Harv. L.Rev. 1761, 1762 (1992) (negligent or intentional misrepresentation). Recently courts have begun to discard the term, realizing that the question of whether to recognize causes of action for "wrongful adoption" simply requires the straightforward application and extension of well-recognized common-law actions, such as negligence and fraud, to the adoption context and not the creation of new torts. *See Roe v. Catholic Charities of the Diocese of Springfield,* 225 Ill.App.3d 519, 588 N.E.2d 354, 357, *appeal denied,* 146 Ill.2d 651, 602 N.E.2d 475 (1992) ("[r]ecognition of this cause of action is not a dramatic, radical departure from the well-established common law * * * [i]t is rather an extension of the doctrine of the common law fraud"); *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 886 (1994) ("causes of action for wrongful adoption are no more than an extension of common law principles to the adoption setting"). With the common law as guidance, we now turn to the instant case.

 Although the Mallettes' amended complaint suggests a number of different causes of action sounding in negligence, their fundamental claim appears grounded in the common-law tort of negligent misrepresentation. We note that in order to establish a prima facie case of negligent misrepresentation, the plaintiff must establish the following elements:

"(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation." *Gibbs,* 538 Pa. at 193, 647 A.2d at

---

**3.** The Mallettes filed a second amended complaint on March 17, 1994, adding a claim of intentional misrepresentation. However, the additional claim was filed subsequent to defen-

dant's petition for certiorari, and as such, both parties agree it is not before the court at this time.

890; *see also, Wallerstein v. Hospital Corp. of America,* 573 So.2d 9, 10 (Fla. Dist.Ct.App.1990); *see generally Halpert v. Rosenthal,* 107 R.I. 406, 413–15, 267 A.2d 730, 734–35 (1970).

With these elements in mind, the narrow issue confronting this court, which is one of first impression, becomes whether to recognize the tort of negligent misrepresentation in the adoption context.

The agency contends that this court should refuse to extend such a cause of action to the adoption context because the agency owed no duty of care to the Mallettes to support any claims of negligence and that Rhode Island public policy militates against such an extension. We disagree.

■ It is well established in Rhode Island that a defendant cannot be held liable under a negligence theory unless the defendant owes a duty of care to the plaintiff and that duty has been breached. *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950 (R.I.1994); *Ryan v. State Department of Transportation,* 420 A.2d 841 (R.I.1980). Whether such a duty exists in a particular factual situation is a question of law for the court's determination. *Ferreira v. Strack,* 636 A.2d 682 (R.I.1994). In determining whether such a duty exists, the court considers "all relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations and notions of fairness." *Kenney Manufacturing Co. v. Starkweather & Shepley, Inc.,* 643 A.2d 203, 206 (R.I.1994). With these principles in mind, we turn to the instant case to address CFS's first contention that it owed no duty to the Mallettes.

■ The agency correctly states that Rhode Island is one of only a handful of states that lacks a statute requiring adoption agencies to disclose relevant information to potential adopting parents. *See* Paula K. Bebensee, *In the Best Interests of Children and Adoptive Parents: The Need for Disclosure,* 78 Iowa L.Rev. 397, 404 n. 65 (1993) (noting that Rhode Island, Nevada, and Alaska do not require agencies to collect or to disclose information on an adoptee's medical

or social background; Minnesota and Kansas require the collection of such information but fail to mandate explicitly its release to adopting parents). Since Rhode Island adoption agencies have no legislative duty to disclose relevant information, CFS contends that it owed no duty to the Mallettes. We disagree.

■ This court has long recognized that a person's *actions,* whether by word or deed, may create a duty of care running to the plaintiff where none existed previously. *See Davis v. New England Pest Control Co.,* 576 A.2d 1240, 1242 (R.I.1990) ("[e]ven one who assumes to act gratuitously, may become subject to the duty of acting carefully if he acts at all"); *Halpert,* 107 R.I. at 415, 267 A.2d at 735 ("[a] misrepresentation, even though innocently made, may be actionable, if made and relied on as a positive statement of fact" and foreseeable damages result). In *Halpert* we recognized implicitly that a duty could be created when a person begins making representations to another stating that "[s]imple justice demands" that the purveyor of *innocent* misrepresentations be held responsible. 107 R.I. at 415, 267 A.2d at 735.

In the adoption context, several of our sister states have specifically imposed a duty to use due care on adoption agencies when they begin *volunteering* information to potential adopting parents. *See, e.g., M.H. v. Caritas Family Services,* 488 N.W.2d 282, 288 (Minn.1992) (adoption agencies have duty to use due care "when they undertake to disclose information about a child's genetic parents and medical history"); *Gibbs,* 538 Pa. at 216, 647 A.2d at 893 (an "adoption agency has assumed the duty to tell the truth when it volunteers information to prospective parents"); *Meracle v. Children's Service Society of Wisconsin,* 149 Wis.2d 19, 32, 437 N.W.2d 532, 537 (1989) (adoption agencies are under no duty to disclose health information, but once they voluntarily undertake to supply such information, a duty to use due care arises). We note that the imposition of a duty in these cases appears predicated not on the varying disclosure statutes of the particular jurisdiction but rather on the adoption agencies' *voluntary* dissemination of health information concerning the child to potential adopting parents.

Turning to the instant case and taking the Mallettes' allegations in the most favorable light, as we must, we are of the opinion that their complaint and supporting documents set forth a cognizable claim for negligent misrepresentation. When CFS began allegedly volunteering information concerning Christopher's and his biological mother's medical and genetic background, the agency assumed a duty to refrain from making negligent misrepresentations. *See Halpert,* 107 R.I. at 415, 267 A.2d at 735; *see also Caritas,* 488 N.W.2d at 288; *Gibbs,* 538 Pa. at 209–11, 647 A.2d at 890; *Meracle,* 149 Wis.2d at 32, 437 N.W.2d at 537. Additionally, the Mallettes have sufficiently pled that CFS breached such a duty by allegedly misinforming the Mallettes of the true state of Christopher's and his family's medical and genetic background. Finally, when the Mallettes alleged that they would not have adopted Christopher if they had known of his medical and genetic background and that their injuries resulted from justifiable reliance on CFS's misrepresentations, a cause of action for negligent misrepresentation was sufficiently set forth. *See Halpert,* 107 R.I. at 413–15, 267 A.2d at 734–35; *see also Wallerstein,* 573 So.2d at 10; *Gibbs,* 538 Pa. at 209–11, 647 A.2d at 890.

The agency counters, however, that extending such common-law liability to the adoption context would violate public policy. First, it asserts that extension of such a tort would create substantial additional burdens upon adoption agencies, which would ultimately undermine the adoption process and the legitimate public policy in favor of adoption. Second, they aver that since there is no statutory obligation for an adoption agency to disclose any information it possesses to potential adoptive parents, extension of the common law tort of negligent misrepresentation would create a perverse incentive: Rhode Island adoption agencies would try and minimize potential liability by limiting disclosures of information to an absolute minimum. We disagree.

We note that among the courts that have been faced with similar factual situations there is a split on the question of whether to extend the common-law tort of negligent mis-representation to the adoption context. California and Iowa appear to be the only states *explicitly* rejecting such an extension. *See Michael J. v. County of Los Angeles, Department of Adoptions,* 201 Cal.App.3d 859, 874–75, 247 Cal.Rptr. 504, 513 (1988) ("adoption agency * * * should not be liable for mere negligence in providing information regarding the health of a prospective adoptee"); *Engstrom v. State,* 461 N.W.2d 309, 316 (Iowa 1990) ("public policy reasons do not favor [a negligence] action by preadoptive parents when an adoption goes sour"); *cf. MacMath v. Maine Adoption Placement Services,* 635 A.2d 359, 361 (Me.1993) (no duty arose when there was no indication that the agency misinformed or withheld information from the plaintiffs). *Foster v. Bass,* 575 So.2d 967, 981 (Miss.1990) (refusing to recognize tort of negligence in adoption context on facts before it because there existed no evidence of misrepresentation, fraud, or evidence that adoption agency failed to "[d]o all that it could"). However, a more recent line of cases has extended such a cause of action to the adoption context noting that this result promotes the public interest. *Catholic Charities,* 225 Ill.App.3d at 536–38, 588 N.E.2d at 365–66 (recognizing cause of action grounded in negligence as encouraging, preserving, and strengthening the basic family units in society); *Caritas,* 488 N.W.2d at 288 ("public policy does not preclude a negligent misrepresentation action against an adoption agency where the agency, having undertaken to disclose information about the child's genetic parents and medical background to the adoptive parents, negligently withholds information in such a way that the adoptive parents were misled as to the truth"); *Gibbs,* 538 Pa. at 212, 647 A.2d at 891 (recognizing tort of negligent misrepresentation, stating that "[t]here is no reason why this cause of action should not be recognized in the adoption context"); *Meracle,* 149 Wis.2d at 32, 437 N.W.2d at 537 (public policy does not bar claim for negligent misrepresentation when an agency made voluntary negligent misrepresentations).

In *Meracle* the adopting parents contacted an adoption agency, requesting a "normal, healthy child." During a preadoption meet-

ing with an employee of the adoption agency, the adopting parents were informed that the child's paternal grandmother had died of Huntington's Disease, but that if one generation remained free of the disease, the next generation would not contract it. The employee concluded that since the child's biological father had tested negative for Huntington's, the child was no more at risk for the disease than any other child. The parents subsequently learned there was no test at that time to determine if the father had inherited Huntington's.

After the child was diagnosed with Huntington's, the parents brought suit against the agency for negligent misrepresentation. In holding that such a claim was not barred by public policy, the court reasoned that once the agency volunteered information about the child's health and genetic background, public policy imposed a duty on it to ensure that their representations were not negligent. However, the court cautioned that adoption agencies were not "guarantors of the health of adopted children" and had no duty to disclose health information. *Meracle*, 149 Wis.2d at 32, 437 N.W.2d at 537.

In *Gibbs* potential adoptive parents "specifically requested [to adopt] a child who was 'hard to place due to age,' but who had no history of sexual or physical abuse or any mental or emotional problems." 538 Pa. at 199, 647 A.2d at 884. The private adoption agency informed the parents that it had a child who was hyperactive and neglected by his biological mother, but the agency "specifically denied any history of physical or sexual abuse." *Id.* at 199, 647 A.2d at 885. Soon after his adoption the child began experiencing severe emotional problems and exhibited extremely violent propensities.

The parents alleged that prior to the adoption both the private adoption agency and the state agency responsible for placing wards of the commonwealth possessed information that the child had a long history of severe physical and sexual abuse. In recognizing a cause of action for negligent misrepresentation, the Pennsylvania Supreme Court stated that "the adoption agency has assumed a duty to tell the truth when it volunteers information to prospective parents, but has

failed to perform that duty." *Id.* at 211, 647 A.2d at 890. The court reasoned that the additional burden placed on adoption agencies to make reasonable efforts to determine whether its representations are true is tempered in several ways: agencies are only under an obligation to make reasonable efforts to determine if their statements are true; agencies may simply refrain from making any representations; liability is limited to those conditions reasonably predictable at the time of placement; and agencies are not insurers or warrantors of a child's development. *Id.* at 211–13, 647 A.2d at 891.

In *Caritas* the adopting parents were told that a slight possibility of incest existed in the child's family background, but otherwise the child was in good health. After serious behavioral and emotional problems set in, one of the child's psychologists contacted the defendant adoption agency for more information on the child's background. The agency produced a document revealing for the first time that the genetic parents were a seventeen-year-old boy and his thirteen-year-old sister. The agency admitted subsequently that it knew of this relationship when it first considered placing the child.

The parents sued the agency, contending that it had made negligent misrepresentations about the child's background. The Minnesota Supreme Court held that public policy did not preclude a claim for negligent misrepresentation against the adoption agency and recognized that such a decision would "'give potential parents more confidence in the adoption process and in the accuracy of the information they receive. Such confidence would be eroded if we were to immunize agencies from liability for false statements made during the adoption process.'" *Caritas*, 488 N.W.2d at 288 (quoting *Meracle*, 149 Wis.2d at 32–33, 437 N.W.2d at 537).

We are in complete agreement with these cases in holding that public policy does not preclude the Mallettes from maintaining a claim for negligent misrepresentation against CFS. In fact recognition of such a tort would promote public policy.

We believe that such a decision would not create any *substantial* additional burdens on

adoption agencies in Rhode Island. The Legislature has imposed no duty on an adoption agency to use reasonable efforts to investigate the medical and genetic background of the child and his or her family.[4] Likewise there is no legislative duty to disclose *any* information concerning a child's background to potential adopting parents. Although the wisdom of such legislative inaction is certainly open to question, we believe that given the competing policy concerns involved, these issues remain squarely within the Legislature's prerogative.

■ We are of the opinion that in order to avoid liability, an adoption agency needs simply to refrain from making representations, or if it does begin making representations it must do so in a nonnegligent manner. *See Gibbs,* 538 Pa. at 211, 647 A.2d at 891 ("agencies may refrain from making any representations at all"); *Meracle,* 149 Wis.2d at 32, 437 N.W.2d at 537 (agencies have no preexisting duty to disclose health information). We caution that our opinion in no way renders adoption agencies guarantors or insurers of a child's future health. *Id.* To guard against such a result, we note that traditional principles of negligence require that the child's condition be reasonably predictable at the time of the adoption. *Gibbs,* 538 Pa. at 213–15, 647 A.2d at 892 (citing *Richard P. v. Vista Del Mar Child Care Service,* 106 Cal. App.3d 860, 867, 165 Cal.Rptr. 370, 373 (1980)).

Although CFS agrees that the situation facing adopting parents remains far from ideal, it counters that given the Legislature's failure to impose a duty to disclose information on adoption agencies, our decision creates the perverse incentive for adoption agencies simply to remain silent. Although this observation possesses a measure of validity, we cannot countenance the alternative result urged by CFS: immunizing adoption agencies from the consequences of making negligent misrepresentations concerning a potential adoptee while heaping awesome legal, ethical, and financial responsibilities on unwitting adopting parents.

Although the Legislature remains conspicuously absent in this area, we are of the opinion that an adoption system based on fairness and fuller disclosure of nonidentifying information concerning the child remains the ideal. We believe our decision moves us a small step closer to such an aspiration. If the adoption agency undertakes to make representations to adopting parents, fairness dictates that they do so in a nonnegligent manner. *See Halpert,* 107 R.I. at 415, 267 A.2d at 735. Conversely, if the adoption agency remains silent in the face of adopting parents' inquiries, the parents will at least be alerted that any decision to adopt should be made ever more cautiously.

We note that the need for accurate disclosure becomes more acute when special-needs children are involved. Parents need to be financially and emotionally equipped to provide an atmosphere that is optimally conducive to that special child's growth and development. Although biological parents can assess the risks of having a child by investigating their own genetic backgrounds, adopting parents remain at the mercy of adoption agencies for information, particularly in this state. We believe extending the tort of negligent representation to the adoption context will help alleviate some of the artificial uncertainty imposed on a situation inherent with uncertainty.

Consequently the defendant's petition for certiorari is denied, and the writ heretofore issued is quashed. The order of the trial justice is affirmed to the extent noted above, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

WEISBERGER, C.J., and BOURCIER, J., did not participate.

---

4. At least one commentator urges imposing a duty on adoption agencies to investigate the adoptees' past, arguing that such an imposition would enable adopting parents to make better informed decisions. Note, *When Love Is Not Enough: Toward a Unified Wrongful Adoption Tort,* 105 Harv. L.Rev. 1761, 1773 (1992).