Ronald A. MANCHESTER, Jr., et al.

v.

Joseph PEREIRA, et al.

No. 2005–350–Appeal.

Supreme Court of Rhode Island.

June 27, 2007.

Raymond A. LaFazia, Providence, for Plaintiffs.

Donald F. DeCiccio, for Defendants.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## O P I N I O N

Justice ROBINSON for the Court.

This civil action stems from a dispute among six people as to the extent of their respective interests in a certain one-acre parcel of real property located in Little Compton, Rhode Island. On May 25, 2005, the trial justice issued a bench decision in which she ruled in large part in favor of the defendants, Joseph Pereira, Monique Medeiros,[1] and Travis Cory. As a result, judgment was entered in the defendants' favor. The plaintiffs, Ronald A. Manchester, Roald Manchester, and Judy Manchester, filed a timely notice of appeal.

On appeal, plaintiffs contend (1) that the quitclaim deed in which Ronald Manchester relinquished his life estate was voidable because he had relied on a misrepresentation by a fiduciary at the time that he signed it; (2) that plaintiffs were entitled to the imposition of a constructive trust on the property because Joseph Pereira had breached his fiduciary duties; (3) that the trial justice exceeded her authority by deciding issues that were not before her; and (4) that the trial justice erred in denying plaintiffs' motion for a new trial.

For the reasons set forth in this opinion, we affirm in part and we reverse in part the judgment of the Superior Court.

### Facts and Travel

The property at issue in this case consists of a one-acre lot upon which were located at the time of trial a house, a trailer, and a camper; the property is

---

1. There is a discrepancy in the record as to Monique's last name. Throughout this opinion when we use her last name, we will use the name Medeiros for the sake of consistency.

located at 20 Snell Road in Little Compton. Ronald A. Manchester, Jr. (Ronald) and his wife, Anna Manchester (Anna), acquired the property from Ronald's parents in 1978 in exchange for a promise to care for and support them. On December 18, 1990, Ronald and Anna conveyed their interest in the property to their son, Roald Manchester (Roald), by means of a quitclaim deed. Ronald and Anna reserved a life estate in the property, and Roald agreed to take care of and support his parents for the rest of their lives. At that point in time, Ronald and Anna were residing in the house, while Roald and his wife Judy were residing in a trailer located on the property.

In 1991, Joseph Pereira (Joseph), Anna's son from a prior relationship, moved into the house with Ronald and Anna. Joseph agreed to contribute financially towards the support of Ronald and Anna, and Roald conveyed his remainder interest in the subject property to himself, Judy, and Joseph on June 19, 1991.

In 1993, Joseph married, and his new family joined him in the Snell Road house. Shortly thereafter, Ronald and Anna moved out of the house into a camper located on the property. Then, in 1994, Joseph and his family moved to Georgia.

In 1998, while Joseph was still residing in Georgia, Roald and Judy decided to borrow money in order to consolidate their debt. Equity Concepts, Inc. (Equity Concepts), the eventual mortgagee, agreed to extend a loan to Roald and Judy, but it required (a) that Roald, Judy, and Joseph grant Equity Concepts a mortgage in the property and (b) that Ronald and Anna relinquish their life estate interest in the property.

Equity Concepts drafted a clear and unambiguous quitclaim deed pursuant to which Ronald and Anna transferred their entire interest in the Snell Road property to Roald, Judy, and Joseph as tenants in common. The deed contained specific language stating that the purpose of the deed was to dissolve Ronald and Anna's life estate in the property. Ronald and Anna both signed the quitclaim deed. At Roald and Judy's request, Joseph signed a power of attorney allowing Roald to execute on Joseph's behalf the necessary documents for the mortgage because Joseph, whose consent to the mortgage was required, would not be attending the closing. The mortgage closing took place on March 24, 1998, and the quitclaim deed was executed the next day. Even after these transactions had taken place, Ronald and Anna continued to reside in the camper, and Roald and Judy continued to live in the trailer. Shortly after the closing and the execution of the deed, Joseph and his family returned from Georgia to live in the Snell Road house.

In June of 2001, Roald, Judy, and Joseph executed a new deed, which allotted Joseph an undivided one-half interest in the Snell Road property and Roald and Judy the other undivided one-half interest. This deed did not contain any language referencing a life estate interest in the property for Ronald.[2]

Also in 2001, Joseph first saw the 1998 quitclaim deed in which Ronald and Anna had relinquished their life estate in the Snell Road property; his wife Debbie discovered it while searching for documentation regarding the property that would be needed in order to obtain a home-improvement loan. When Ronald was shown the deed, he did not appear to remember it. Despite this development, Ronald continued to live in the camper, Roald and Judy continued to live in the trailer, and Joseph

---

**2.** Anna had died in 1999.

and his family continued to live in the house.

In the Summer or Fall of 2004, when Joseph and his family were preparing to move out of the house once again, Joseph decided to allow his niece, Monique Medeiros (Monique), and her family (including Travis Cory (Travis)) to occupy the house. Ronald, Roald, and Judy all objected to this arrangement, but Joseph nonetheless followed through with the plan.

Thereafter, in October of 2004, Ronald, Roald, and Judy initiated this lawsuit, in which they alleged that Joseph was guilty of fraud, breach of fiduciary duty, and breach of contract. In their original complaint, plaintiffs sought (1) "a mandatory injunction requiring defendants to refrain from any obstructions to the lawful use of the premises by the plaintiffs"; (2) a declaration that Ronald still possessed his life estate; and (3) partition.

Subsequently, in an amended complaint that was filed on November 10, 2004, plaintiffs sought (1) a mandatory injunction to enjoin Joseph from transferring any interest in the property and to enjoin Monique and Travis from depriving Ronald of complete access to the house; (2) a declaration that Monique and Travis are trespassers; (3) an order requiring Joseph to execute a deed evidencing a life estate in Ronald; (4) a declaratory judgment regarding the rights and obligations of all of the parties; and (5) partition.[3]

At the hearing on plaintiffs' motion for injunctive relief that was held on November 12, 2004, Monique Medeiros testified that Ronald was living in one of the two "trailers"[4] situated on the Snell Road property and that Roald and his wife Judy

were living in the other "trailer" on the property. Ms. Medeiros also stated that Ronald was invited to enter the house at any time to retrieve his clothes. The hearing justice denied plaintiffs' motion for injunctive relief, indicating that they did not have a substantial probability of prevailing on the merits.

At some point in November of 2004, Ronald moved out of the camper and into the trailer with Roald and Judy. Then, in December of 2004, Roald and Judy executed a quitclaim deed, which conveyed to Ronald a life estate interest in Roald and Judy's interest in the Snell Road property. The trial justice and counsel for all of the parties agreed that this deed would not be treated as an admission or as evidence of Judy or Roald's recognition of the 1998 deed signed by Ronald. The deed was delivered on April 21, 2005.

A nonjury trial took place in April and May of 2005. At the trial, Judy Manchester testified that she was solicited by Donald Chokoian of Equity Concepts in connection with refinancing the Snell Road property in 1998. During the course of obtaining the mortgage through Equity Concepts, Judy received by fax from Mr. Chokoian a quitclaim deed for Ronald and Anna to sign. Judy explained that she was told that that signed quitclaim deed was needed so that "if [she and Roald] missed three consecutive payments or defaulted on [their] mortgage, then the bank * * * had the right to come down and take the property." She testified that Mr. Chokoian represented to her that the deed would not be recorded but rather "stood with [their] mortgage, unless [they] defaulted on payments." Judy stated that

---

3. By agreement of the parties, the partition count was dismissed pursuant to Rule 41 of the Superior Court Rules of Civil Procedure.

4. Although the rest of the record indicates that there was one trailer and one camper located on the Snell Road property, Monique's testimony referred to both of the vehicles as trailers.

she was led to believe that Ronald and Anna would retain their life estate in the property as long as Judy and Roald paid the mortgage payments. She also testified that it was in October of 2004 that she first learned that the deed had been recorded; it was at that same time that Debbie showed the deed to Ronald.

Roald Manchester also testified at trial. Roald stated that Judy had presented him with the 1998 quitclaim deed so that he could bring it to his parents, Ronald and Anna, to sign. According to Roald, Judy explained to him that the deed would not change any of the property arrangements but that Equity Concepts would simply keep it in case Judy and Roald failed to make their mortgage payments. Roald admitted, however, that there was no written document reflective of such an understanding. Roald further stated that he thought that Ronald and Anna were co-signing the mortgage—which, in his mind, meant that all of them (Ronald, Anna, Roald, Judy, and Joseph) would lose the Snell Road property if Roald and Judy defaulted on the mortgage. When Roald presented the quitclaim deed to his parents, he explained to them that there would be no consequences if Roald and Judy made the appropriate mortgage payments each month. Roald denied fully understanding the effect of the quitclaim deed or realizing that the deed transferred any part of his parents' interest to him.

Roald further testified that he discussed the loan with Joseph, who was in Georgia at the time. Roald informed Joseph that he and Judy were "going for a consolidation loan" and that there would be some papers that Joseph would have to sign. Although Roald also informed Joseph that Ronald and Anna would have to sign some papers, Roald admitted that he did not tell

Joseph that those papers included a quitclaim deed. Roald testified that he left out this detail because he did not believe that Ronald and Anna were relinquishing their life estate at that time. According to Roald, Joseph understood at the time when Roald signed Joseph's name to the quitclaim deed (pursuant to a power of attorney) that Ronald and Anna held a life estate in the property and would live there until they died.

Roald also testified that the 1998 quitclaim deed was first brought to his attention around the time that Monique was moving into the house situated on the Snell Road property.[5] According to Roald, he had a discussion with Joseph at that time because Roald believed that Ronald should move into the house instead of Monique. Roald also stated that he expressed concern about Monique's moving in due to the fact that there was a problem with the septic system. When Roald saw Monique moving in, he went over to the house, where he confronted Joseph and Debbie. According to Roald, Debbie bluntly told Roald that Ronald no longer had a life estate in the property and that "there's nothing [Roald could] do about it."

Joseph Pereira testified that, prior to the execution of the 1998 deed in which Ronald and Anna purportedly relinquished their life estate, he knew that Ronald and Anna had the right to live on the Snell Road property for the rest of their lives, but he did not understand that that meant that they had the right to exclude anybody from the property. He stated that it was agreed that Ronald and Anna would live on the property for the rest of their lives but that it was not specified exactly where on the property they had the right to live.

---

**5.** It will be recalled that it was in the latter half of 2004 that Joseph indicated that he wanted Monique and her family to occupy the home.

Joseph further testified that he first learned of the 1998 deed in which Ronald and Anna relinquished their life estate when his wife discovered it while searching for documents to be used in connection with obtaining a home-improvement loan in 2001. He stated that, even after viewing that deed, he did not realize that it had the effect of extinguishing Ronald and Anna's life estate. He also testified that neither Ronald nor Anna ever told him that they had given up their life estate in the property, and Joseph stated that Ronald was surprised when he was informed of the 1998 deed because he thought that he still had a life estate in the property. Joseph testified that he did not pay Ronald and Anna any money in return for the relinquishment of their life estate in the property through the 1998 deed. Although in his testimony Joseph initially stated that he believed that Ronald still had a life estate in the Snell Road property, immediately thereafter upon questioning by the trial justice, he acknowledged that he did know that Ronald had given up his life estate in the property.

According to Joseph, Ronald expressed his dissatisfaction with Monique's moving into the house on the Snell Road property, citing a septic system problem as the reason. Joseph further testified that, during a discussion that he and his wife had with Ronald, Debbie showed the 1998 quitclaim deed to Ronald and said: "[Y]ou don't have a life estate anymore, which means you don't have any rights." She proceeded to blame Roald and Judy for the predicament in which Ronald found himself. Joseph testified that Ronald acted as if he had never seen that deed before.

Joseph also testified that he had always locked the doors to the house on the Snell Road property while he was living there but that Ronald knew where the key was and, therefore, was able to let himself into the house whenever he desired. According to Joseph, although Monique kept the doors locked, Ronald was allowed into the house whenever he indicated a wish to do so by knocking on the door.

Ronald Manchester also testified at the trial. He stated that he voluntarily signed the 1998 quitclaim deed so that Roald and Judy could receive the loan that they were seeking in an effort to consolidate their debt, lower their interest rate, and borrow money. According to Ronald, it was his understanding that he and Anna had to sign the deed "in case there was a default in the payment," in which case he and Anna would be responsible for the payments or the property would be lost. Ronald testified that he did not intend to give up his life estate by signing that deed and that he did not receive anything in return for signing it. Ronald also testified that Roald and Judy had never communicated to him that they thought that Ronald had extinguished his life estate.

Ronald stated that he first learned that the effect of the deed was to extinguish his life estate in the Snell Road property on October 27, 2004, when Debbie showed it to him and stated: "Look what your son did to you. * * * Your son Roald." Ronald testified that Joseph and his wife claimed that they would not have let Ronald and Anna sign the 1998 quitclaim deed if they had been present when Roald and Judy were attempting to obtain the mortgage.

Ronald further testified that he had told Joseph that he did not want anyone else living on the property. He also stated that he had complete access to the house at all times before Monique moved in because the door was always unlocked when Joseph was home. Ronald further asserted that he had possessions in the house, as did Roald.

Monique Medeiros also testified at the trial. She stated that a discussion between Roald and Debbie occurred just before she moved into the house situated on the Snell Road property because Roald did not want Monique to move in. She admitted that, although she had received permission from Joseph, she did not have permission from Roald, Judy, or Ronald to be on the property.

On May 25, 2005, the trial justice issued her bench decision, and she asked defendants to present an order and final judgment. The trial justice denied and dismissed all of plaintiffs' claims except that she made the following declarations: (1) Joseph holds a present, "undivided one-half interest in fee in common" in the 20 Snell Road property; (2) with respect to the house on that property, Joseph has rights of use and control (which include the right to allow tenants, guests, and other invitees to enter and occupy) to the exclusion of Ronald, Roald, and Judy; (3) Roald and Judy hold an undivided one-half interest in the property but their interest is subject to a life estate held by Ronald; and (4) Joseph and Roald are contractually obligated to continue performing on the 1991 agreement by paying to or for the benefit of Ronald a total of $75,000 each in $400 monthly increments.

On June 16, 2005, the parties appeared before the trial justice again because she was concerned about an eviction proceeding that had been initiated by plaintiffs. The trial justice reiterated that "Joseph Pereira's rights of use and control of the single-family residence on the property include the right to allow tenants, guests and other invitees, including Monique Medeiros and Travis Cory, to enter upon the property and occupy the house." The parties also returned to court on July 27, 2005 to address defendants' request for injunctive relief. On August 15, 2005, the trial jus-

tice restrained and enjoined plaintiffs from interfering with defendants' quiet enjoyment of the Snell Road property. The order and judgment were also entered on that day. A motion for a new trial was heard and denied on October 27, 2005. The plaintiffs filed a timely notice of appeal.

## Standard of Review

This Court views deferentially the factual findings of a trial justice sitting in a nonjury case. *Dellagrotta v. Dellagrotta*, 873 A.2d 101, 109 (R.I.2005); *see also Riley v. Stafford*, 896 A.2d 701, 703 (R.I.2006) (mem.); *Vigneaux v. Carriere*, 845 A.2d 304, 306 (R.I.2004). We will not disturb his or her findings "unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties." *Vigneaux*, 845 A.2d at 306 (internal quotation marks omitted); *see also Dellagrotta*, 873 A.2d at 109. When faced with a trial justice's rulings regarding questions of law, however, we will conduct a *de novo* review. *Dellagrotta*, 873 A.2d at 109; *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I. 2001).

## Analysis

### I

### Plaintiffs' Misrepresentation Claim

The plaintiffs first assert that the trial justice erred in her conclusions regarding their misrepresentation claim. Specifically, they contend that the 1998 quitclaim deed that dissolved Ronald's life estate in the property was voidable because he signed it in reliance on a misrepresentation by his fiduciaries. We disagree.

■ It is well established that, in order to prevail on a misrepresentation claim, one must prove justifiable reliance on the misrepresentation. *Mallette v. Children's Friend and Service*, 661 A.2d 67, 69 (R.I. 1995); *see also Francis v. American Bankers Life Assurance Co. of Florida,* 861 A.2d 1040, 1046 (R.I.2004); *Zarrella v. Minnesota Mutual Life Insurance Co.,* 824 A.2d 1249, 1257 (R.I.2003). For example, in *Mallette*, 661 A.2d at 69, we wrote as follows:

> "[T]o establish a prima facie case of negligent misrepresentation, the plaintiff must establish the following elements: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting *in justifiable reliance on the misrepresentation.*" (Internal quotation marks omitted.) (Emphasis added.)

■ In the instant case, Ronald unreasonably relied upon Roald's representation that the quitclaim deed of March 25, 1998 would not extinguish Ronald's life estate in the Snell Road property. The language of the deed is pellucid as to its purpose; it reads: "THE PURPOSE OF THIS QUIT–CLAIM DEED IS TO DISSOLVE THAT CERTAIN LIFE ESTATE GRANTED TO GRANTORS AS RECORDED ON JUNE 21, 1991 * * *." It is clear to us that no reasonable person would have signed this document based merely upon another person's secondhand assurance that the document would not dissolve the life estate. We note in this regard that it has long been a settled

principle that "a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." *F.D. McKendall Lumber Co. v. Kalian*, 425 A.2d 515, 518 (R.I.1981); *see also Gorman v. Gorman*, 883 A.2d 732, 737 n. 7 (R.I.2005); *Fleet National Bank v. 175 Post Road, LLC*, 851 A.2d 267, 275 (R.I.2004); *Westerly Hospital v. Higgins*, 106 R.I. 155, 160, 256 A.2d 506, 509 (1969); *Murray v. Cunard S.S. Co.*, 235 N.Y. 162, 139 N.E. 226, 228 (1923) (Cardozo, J.) (stating that one "who omits to read takes the risk of the omission"). In this case, Ronald signed the 1998 quitclaim deed; as a result, he must be deemed to have read it and to have assented to its contents. *See Kalian*, 425 A.2d at 518.

Accordingly, we hold that plaintiffs' misrepresentation claim must fail, and we uphold the trial justice's decision in this respect.

## II

### Breach of Fiduciary Duty Issue

■ The plaintiffs also suggest that the trial justice erred in finding that there was no breach of a fiduciary duty. They contend that Joseph had a fiduciary relationship with Roald and that Joseph was in a separate fiduciary relationship with Ronald, Roald, and Judy. The plaintiffs seem to argue, although not in a particularly developed manner, that these fiduciary relationships were breached and that, therefore, the Superior Court should have imposed a constructive trust. We disagree.

We have previously held that "[t]he underlying principle of a constructive trust is the equitable prevention of unjust enrichment of one party at the expense of another in situations in which legal title to property was obtained by fraud or in violation of a fiduciary or confidential relationship."

*Renaud v. Ewart,* 712 A.2d 884, 885 (R.I. 1998) (mem.); *see also Dellagrotta,* 873 A.2d at 111. We have also stated that "[a] constructive trust will be imposed upon property that is obtained in violation of a fiduciary duty." *Simpson v. Dailey,* 496 A.2d 126, 128 (R.I.1985).

In order to convince the court that imposition of a constructive trust is warranted, a plaintiff is required to show by clear and convincing evidence (1) that a fiduciary duty existed between the parties and (2) that either a breach of a promise or an act involving fraud occurred as a result of that relationship. *Renaud,* 712 A.2d at 885; *see also Cahill v. Antonelli,* 120 R.I. 879, 882–83, 390 A.2d 936, 938 (1978).

At trial, Ronald contended that Joseph assumed a position of trust which carried with it fiduciary responsibilities towards Ronald when he agreed to take care of Ronald and Anna. Ronald further asserted that Joseph (1) breached this duty by taking advantage of Ronald's alleged misunderstanding of the March 25, 1998 quitclaim deed and (2) committed fraud by refusing to convey to him an exclusive life estate in the property.

We need not reach the issue of whether any fiduciary duties were owed by Joseph since, even if he had such duties, it is clear from the record that there is no basis for finding any breach. The trial justice concluded that Joseph owed no duty to convey to Ronald an exclusive life estate enabling him to decide whether or not Monique could reside in the house on the Snell Road property, and we agree. Since we have held in section I, *supra,* that no reasonable person could have been mistaken as to the effect of the March 25, 1998 deed, it follows that there is no basis for finding a violation of any fiduciary duties Joseph may arguably have had. Furthermore, Jo-

seph had never promised to grant Ronald an exclusive life estate in the property.

Accordingly, we deny plaintiffs' appeal in this respect.

## III

### Trial Justice's Alleged Overreaching

The plaintiffs also argue that the trial justice exceeded her authority when she addressed matters that were not properly before her. Specifically, they contend that the only issue in this case was "whether or not the life estate which Ronald relinquished in the quitclaim deed of March [25], 1998, should be reconveyed to Ronald." They assert that the trial justice "ordered an illegal subdivision, usurped the authority of the town in violation of its zoning ordinances, and violated Ronald's rights of due process by unlawfully excluding him from his own property and enjoining him from seeking use and occupancy." We agree with the essence of plaintiffs' contention in this regard (although not with much of their phraseology), and we reverse the trial justice's ruling with respect to the rights of these tenants in common (viz., Roald and Judy on the one hand and Joseph on the other).

This Court has previously held that "cotenants who take by a deed which does not otherwise identify the extent of their respective interests" possess equal shares of the property. *Lucchetti v. Lucchetti,* 85 R.I. 105, 111, 127 A.2d 244, 248 (1956). Additionally, a tenant in common may not use the property in such a way as to exclude other cotenants from enjoying their equal privileges. *Silvia v. Helger,* 75 R.I. 397, 399, 67 A.2d 27, 28 (1949) ("It is a well-recognized rule of law that one tenant in common may make any reasonable use of the land held, so long as it does not operate to exclude the other tenants from enjoying their equal privileges."); Sheldon

F. Kurtz, *Moynihan's Introduction to the Law of Real Property* 281 (4th ed. 2005) (stating that each cotenant "is entitled to possession and enjoyment of the whole property and every part thereof subject to the same right in the other tenants"). We are in full accord with the statement that "each of the tenants is entitled to possession of the entire property subject to a reciprocal right in [the] cotenants * * *." Kurtz, *supra*, at 282.

In the instant case, however, the judgment signed by the trial justice specifically declared that Joseph possessed rights of use and control over the house on the Snell Road property to the same extent as would a "sole owner in fee simple absolute." That declaration was based upon the trial justice's finding that the parties had orally agreed to the following in connection with the 1991 deed: (1) Roald and Joseph would each pay Ronald and Anna $75,000, payable in $400 monthly increments; (2) Ronald and Anna would have the right to live on the property; (3) Joseph would have control and possession of the house; and (4) Roald would have control and possession of the trailer. The trial justice noted that, even though the 1991 agreement was never reduced to writing, the parties had been acting in accordance with its terms for many years. Consequently, the trial justice held that Joseph possessed the authority to rent the premises or to allow others to live there. It is our view that the trial justice erred in so concluding.

The 1991 quitclaim deed transferred Roald's remainder interest in the subject property to himself, Judy, and Joseph as tenants in common. No other details as to each of the cotenants' interests were mentioned in the deed, and there is insufficient support in the record for the trial justice's finding that plaintiffs had agreed to allow Joseph to permit tenants, guests, or other invitees to reside in the house on the Snell Road premises on a long-term basis. In reaching that conclusion, the trial justice noted that the parties had been performing on such an agreement for years. Although it is accurate that the parties had each resided in their respective structures for many years (and therefore we agree with the trial justice's conclusion that an agreement was reached as to where on the premises each of those involved in the 1991 agreement would live), there is insufficient evidence in the record to support the finding that the parties had allowed Joseph to permit tenants, guests, or other invitees to reside in the house on a long-term basis.

Since there is insufficient evidence that an agreement between the parties existed altering their respective rights as tenants in common, we shall abide by the above-referenced common law principles regarding cotenancy. Accordingly, we conclude that, as a result of their relationship as cotenants, Joseph holds *exactly the same rights* (no more and no less) with respect to the Snell Road property, including the house, as do Roald and Judy. Consequently, we hold that the trial justice erred in ruling that Joseph has the right to invite Monique Medeiros and Travis Cory to occupy the house when Roald and Judy oppose such an arrangement, and we reverse the trial justice's judgment in this respect.

## IV

### Motion for a New Trial

■ Finally, plaintiffs contend that the trial justice erred in denying their motion for a new trial. They argue that the trial justice was "[i]n violation of the statute of frauds," and they contend that "[s]he granted injunctive relief in violation of the plaintiffs' rights of due process and in violation of the Rules of Civil Procedure and the canons of judicial conduct."

We have previously interpreted Rule 59(a) of the Superior Court Rules of Civil Procedure, which governs motions for new trials, and we have held that a trial justice sitting without a jury may grant a new trial only

> "(1) if there is an error in the judgment that is manifest on the face of the record without further examination of matters of fact or evidence; [6] or (2) if the trial justice is satisfied that newly discovered evidence has come forward which was not available at the first trial and is of sufficient importance to warrant a new trial." *Tillson v. Feingold,* 490 A.2d 64, 66 (R.I.1985).[7]

In the instant case, plaintiffs do not contend that newly discovered evidence exists. Rather, they argue that the trial justice violated the statute of frauds, as well as their due process rights, the Rules of Civil Procedure, and the canons of judicial conduct; we conclude, therefore, that they have implicitly invoked the first ground upon which to base a motion for a new trial.

Since we have held in section III, *supra,* that the trial justice erred in ruling that

Joseph had the authority to exclude Roald and Judy from the house and have reversed that portion of the judgment, we need not address the plaintiffs' motion for a new trial to the extent that it deals with that ruling. As to their contentions regarding the rest of the trial justice's decision, however, it is our view, in accordance with our other rulings in this opinion, that there is no "error in the judgment that is manifest on the face of the record." *Tillson,* 490 A.2d at 66. The motion for a new trial was properly denied.[8]

## Conclusion

For the reasons set forth in this opinion, we affirm in part and we reverse in part the judgment of the Superior Court. The record may be remanded to the Superior Court for entry of a new judgment consistent with this opinion.

Justice SUTTELL did not participate.

---

6. We have indicated that "a manifest error of law in a judgment would be one that is apparent, blatant, conspicuous, clearly evident, and easily discernible from a reading of the judgment document itself." *American Federation of Teachers Local 2012 v. Rhode Island Board of Regents for Education,* 477 A.2d 104, 106 (R.I.1984); *see also Bernier v. Lombardi,* 793 A.2d 201, 202 (R.I.2002).

7. *See also Retirement Board of the Employees' Retirement System v. DiPrete,* 845 A.2d 270, 288 (R.I.2004); *Bernier v. Lombardi,* 793 A.2d 201, 202 (R.I.2002); *Anthony v. Searle,* 681 A.2d 892, 898–99 (R.I.1996); *Colvin v. Goldenberg,* 108 R.I. 198, 208, 273 A.2d 663, 669 (1971).

8. The plaintiffs also suggest the existence of several other contentions that they identify as "specific questions raised." However, they have failed to present us with any meaningful

argument in support of those vaguely alluded-to contentions. In light of our well established rule that we will not substantively address an issue that was not adequately briefed, we do not reach any of those other purported contentions. *See Wilkinson v. State Crime Laboratory Commission,* 788 A.2d 1129, 1131 n. 1 (R.I.2002) ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."); *see also* Article I, Rule 16 of the Supreme Court Rules of Appellate Procedure; *James J. O'Rourke, Inc. v. Industrial National Bank of R.I.,* 478 A.2d 195, 198 n. 4 (R.I.1984); *Mercurio v. Fascitelli,* 116 R.I. 237, 243, 354 A.2d 736, 740 (1976).