**Supreme Court**

No. 2011-132-Appeal.
(NM 02-603)

Frederick Carrozza, Sr., et al.       :

v.       :

Michael Voccola, in his capacity as       :
executor of the Estate of Frederick
Carrozza, Jr., et al.

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Frederick Carrozza, Sr., et al.          :

                    v.                    :

Michael Voccola, in his capacity as       :
  executor of the Estate of Frederick
        Carrozza, Jr., et al.


Present:  Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The counterclaim defendants, Frederick Carrozza, Sr.

(Frederick Sr.) and his living children (Phillip Carrozza, Freida Carrozza, and Laurie Carrozza-

Conn),[1] appeal from a judgment rendered by the Newport County Superior Court on December

17, 2010.  The trial justice held the counterclaim defendants liable for slander of title, finding

---

[1]      In this opinion, we shall refer to the original defendants (viz., Michael Voccola, Esq., in his capacity as executor of the estate of Frederick Carrozza, Jr.; Angela Giguere, Frederick Carrozza, Jr.'s widow; and Christine Giguere-Carrozza, Frederick Carrozza, Jr.'s adopted adult daughter) as the counterclaimants.  We shall refer to the plaintiffs in the underlying case (viz., Frederick Carrozza, Sr., who is Frederick Carrozza, Jr.'s father; and Frederick Carrozza, Sr.'s younger children: Phillip Carrozza; Freida Carrozza; and Laurie Carrozza-Conn) as the counterclaim defendants.  In view of the fact that the record contains several variations in the spelling of certain names, we shall adhere to the spelling which we employed in our earlier opinion.  See Carrozza v. Voccola, 962 A.2d 73 (R.I. 2009).  In addition, for the sake of clarity, in this opinion we shall refer to Frederick Sr. and his children by their first names.  In so doing, we intend no disrespect.

that notices of lis pendens were maliciously filed by the counterclaim defendants on the four properties at issue in the case. The counterclaim defendants contend that the trial justice erred: (1) when he held that the counterclaimants (Michael Voccola, in his capacity as executor of the estate of Frederick Carrozza, Jr.; Angela Giguere; and Christine Giguere-Carrozza) had met the required burden of proof to establish slander of title; (2) when he awarded compensatory damages based on the difference between the highest value of the properties attained during the period of time in which they were subject to the notices of lis pendens and the value of the properties when the notices of lis pendens were removed; (3) when he ruled that prejudgment interest should run from the date on which the notices of lis pendens were filed; (4) when he awarded punitive damages in the amount of $845,000 against Frederick Sr.; and (5) when he held Phillip, Freida, and Laurie liable for slander of title despite the fact that they were not parties to this civil action at the time that the notices of lis pendens were filed in 2002.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court in part and vacate that judgment in part.

## I

## Facts and Travel

This case began on November 15, 2002, when Frederick Sr. filed a petition in the Superior Court seeking to impose a resulting trust on four properties, title to which had been in the name of his son, Frederick Carrozza, Jr. (Frederick Jr.), at the time of the son's death.[2]  For

---

2    The four properties at issue in this case were described in the decision of the Superior Court justice who presided over the slander of title trial as follows: "[(1)] Unit 47 River Farms Condominium, West Warwick, Rhode Island; [(2)] 1101 Post Road, Warwick, Rhode Island; [(3)] Prospect Hill Street in Newport, Rhode Island; and [(4)] 103-111 Bellevue Avenue, Newport, Rhode Island." According to the "Joint Statement of Undisputed Facts," entered by the parties on May 27, 2010, all four of the properties at issue were owned by Frederick Jr. at the time of his death.

present purposes, we need not rehash all of the facts relative to the resulting trust litigation; those facts are recited in detail in our opinion affirming the Superior Court's grant of summary judgment in favor of the counterclaimants, wherein this Court ruled that there was no resulting trust. See Carrozza v. Voccola, 962 A.2d 73 (R.I. 2009). We once again[3] recall the words that Homer has Ulysses utter at the conclusion of Book XII of The Odyssey: "It goes against my grain to repeat a tale told once, and told so clearly."[4] Mindful of Homer's lament, we refer the interested reader to our first Carrozza opinion. See Carrozza, 962 A.2d at 74-75.

What is of primary present significance, however, is the fact that, at the outset of the resulting trust litigation, on November 15, 2002, Frederick Sr. caused notices of lis pendens to be filed with respect to each of the properties at issue, which notices were not removed until February of 2009. The filing of the notices of lis pendens prompted the counterclaimants to file a counterclaim alleging slander of title. After this Court affirmed the granting of their motion for summary judgment with respect to the resulting trust issue, we remanded the case to the Superior Court for the resolution of the slander of title counterclaim. See Carrozza, 962 A.2d at 78-79.

On remand, the Superior Court conducted a jury-waived trial over the course of two days in June of 2010, during which several witnesses testified. Thereafter, on December 17, 2010, the trial justice rendered his decision holding the counterclaim defendants liable for slander of title,

---

The "Joint Statement of Undisputed Facts" and many of the filings by the parties referenced in this Court's discussion have headings which use all capital letters, are underlined, or employ bold-face type. We have conformed those headings to our usual style throughout this opinion.

[3] See Cranston Teachers' Association v. Cranston School Committee, 423 A.2d 69, 69 (R.I. 1980) (quoting The Odyssey, Book XII).

[4] Homer, The Odyssey, Book XII, 285 (Robert Fagles trans. 1996).

which decision is the focus of this appeal. On February 18, 2011, a hearing was held in the Superior Court on the counterclaim defendants' motion for a new trial; that motion was denied.

We shall next proceed to discuss the significant testimony and other evidence from the slander of title trial.

At trial, Paul Hogan, a real estate appraiser who was qualified as an expert, testified on behalf of the counterclaimants as to the highest value attained by each of the properties at issue between November 15, 2002, when the notices of lis pendens were filed, and February 2, 2009, when clear title to the properties was restored; he also testified as to the value of the properties at the end of that period, in February of 2009. He testified that the value of the property located at Bellevue Avenue in Newport was $1,835,000 in February of 2009 and $2,310,000 at its highest value, in September of 2005. According to Mr. Hogan's testimony, the value of the property located at Prospect Hill Street in Newport was $200,000 in February of 2009 and $250,000 at its highest value, in September of 2005; he added that the value of the property located on Post Road in Warwick was $320,000 in February of 2009 and $365,000 at its highest value, in September of 2005. Finally, Mr. Hogan testified that the value of the River Farm Condominium located in West Warwick was $280,000 in February of 2009 and $340,000 at its highest value, in September of 2005. The counterclaim defendants did not object to Mr. Hogan's testimony at any point.

Attorney Voccola, the executor of the estate of Frederick Jr., testified that the notices of lis pendens prevented him from consummating a transaction at a time when he was offered two and a half million dollars to sell two of the properties at issue.[5] He also stated that he did not

---

[5] John R. Gullison, who was identified as the potential buyer of the two properties referenced in the text, corroborated Mr. Voccola's statement by testifying that he had been "prepared to make an offer." However, the trial justice concluded that Mr. Gullison's testimony

attempt to sell the other two properties because there "was no reason to go through the motions" since he was "unable to provide a clean, marketable and insurable title" due to the notices of <u>lis pendens</u>.

In his bench decision after the trial concluded, the trial justice stated that, although he considered most of Frederick Sr.'s testimony to be a "knowing fabrication," he had observed a "shining moment of truth" when, in response to having been asked why he had initiated a lawsuit against Frederick Jr., his response was as follows: "Because it was my money. I thought I could get it back." Frederick Sr. further indicated in his testimony that he wanted to get the properties back because he did not have any additional properties to provide to his other three children. The trial justice referred to these statements made by Frederick Sr. as "telling and determinative" with respect to his eventual ruling. Specifically, the trial justice found Frederick Sr.'s testimony to reflect a clear indication that he had not filed suit "to establish and recover property rightfully his, rather he filed suit to collect a debt that he believed arose in 1998 when [Frederick Jr.] sold" a fifth property (located on Malbone Road in Newport) which was not a subject of this dispute.[6]

---

at trial was "not credible." In the words of the trial justice, Mr. Gullison had merely engaged in "tire-kicking," which the trial justice found "not to have been a real effort to purchase the property."

[6] With respect to the property located at Malbone Road in Newport, the trial justice found that Frederick Sr. purchased the property in 1987 and ultimately transferred title of the property to Frederick Jr. for no consideration in 1990. Then, according to the trial justice's findings of fact, Fredrick Jr. "sold the Malbone Parcel without Frederick Carrozza, Sr.'s knowledge or consent on or about March 18, 19[9]8." The trial justice further found that, "[w]ithout Frederick Carrozza, Sr.'s knowledge or consent, Frederick Carrozza, Jr. kept the net proceeds of the sale of the Malbone Parcel and used those proceeds for his own benefit, specifically to pay off a margin call to Charles Schwab following a decline in the value of the Oxford Health Company stock which was owned by [Frederick Jr.] at the time." The trial justice also found that the sale of the property located at Malbone Road was "[the] main factor that caused an estrangement between Frederick Carrozza, Sr. and Frederick Carrozza, Jr.," which was not resolved prior to Frederick Jr.'s death.

It is important to note that, with respect to the four properties actually at issue in this case, this Court, in its earlier decision, recognized that Frederick Sr. had "testified that he had

After the trial had concluded, the trial justice found in favor of the counterclaimants and held that Frederick Sr., as well as his three living children (see infra), were liable for slander of title. The counterclaimants were awarded compensatory damages of $630,000; in addition, they were awarded prejudgment interest from the date the suit was filed in 2002, expenses of $24,080.40, and attorneys' fees of $151,267.[7] Frederick Sr. alone was found liable for punitive damages in the amount of $845,000. The trial justice based his calculation of compensatory damages upon the diminution in the value of the properties during the period of time when the notices of lis pendens were in place, which was measured by the difference between the highest value of the four properties at issue during that period of time (which occurred in September of 2005) and the value of the properties when clear title was restored in February of 2009. He stated that over that period "each of the properties lost substantial value."

Frederick Sr.'s living children were not parties to the lawsuit in 2002 at the time the notices of lis pendens were filed. The trial justice determined that, thereafter, Phillip "voluntarily" joined the case, whereas Freida and Laurie were joined as necessary parties.[8] The

contributed part of the purchase price" of both the property located at Bellevue Avenue in Newport and the property located at Post Road in Warwick, but that he had provided "conflicting accounts about" those acquisitions. Carrozza, 962 A.2d at 77. We held that there was a lack of evidence showing that Frederick Sr. "intended to retain a specific share of either property" and that, accordingly, a resulting trust had not arisen. Id. We further held that the evidence "reinforce[d] [the] presumption" that the River Farm Condominium was a gift from Frederick Sr. to Frederick Jr., and that the evidence also showed that Frederick Sr. did not contribute to the purchase price of the property located at Prospect Hill Street in Newport. Id. at 77-78.

[7] The trial justice was wont to use the term "legal fees" to refer to the attorneys' fees that he eventually awarded to the counterclaimants.

[8] The parties in this case entered into a stipulation with respect to the joining of Phillip, Freida, and Laurie, which was read into the record at the slander of title trial. It provided as follows:

"The pleadings in the [c]ourt record show the following sequence of events that led to the addition of Phillip Carrozza, Laurie

- 6 -

trial justice relied on Rule 15(c) of the Superior Court Rules of Civil Procedure[9] in holding that the "First Amended Miscellaneous Petition" (filed on December 23, 2004), which added Frederick Sr.'s living children as plaintiffs (later to become counterclaim defendants), related back to the filing of the notices of lis pendens by Frederick Sr. in 2002. Accordingly, the trial justice found that Frederick Sr.'s living children were also liable for slander of title along with their father; the basis for that ruling was the trial justice's determination that Phillip, Freida, and Laurie "[were] not unwilling participants in the lawsuit." He reasoned that they had "clearly stood with their hands outstretched, waiting for a decision of this [c]ourt that would place [Frederick Jr.'s] property in those outstretched hands."

After judgment had been entered, the counterclaim defendants filed a timely notice of appeal. The counterclaim defendants also filed a motion for a new trial, which was denied.[10]

---

> Carrozza, Freida Carrozza as party plaintiffs. One [Frederick Sr.] moved to add Phillip Carrozza as a party. Two, [the counterclaimants] objected and stated a joinder should include all of the children. Three, [Frederick Sr.] objected to the addition of Laurie and Freida Carrozza. Four, after a hearing, Justice Fortunato granted [the counterclaimants'] motion, and all of the children were required to be added as plaintiffs."

[9] Rule 15(c) of the Superior Court Rules of Civil Procedure is quoted in its entirety in Part IV.C, infra.

[10] Rule 59(a) of the Superior Court Rules of Civil Procedure provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues for error of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in the courts of this state."
In support of their motion for a new trial, the counterclaim defendants argued that the trial justice's method of calculating "actual damages" was not the correct method; specifically, the counterclaim defendants contended that the damages should have been calculated by comparing the value at the time when the notices of lis pendens were recorded with the value at the time when clear title to the property was restored, "in which event there [would] be no damage * * *." The counterclaim defendants further argued: (1) that prejudgment interest should have been calculated from the date the properties were at their highest value in 2005 rather than from the date when the action was commenced; and (2) that there was error in the assessment of punitive damages because, in awarding the punitive damages, the trial justice

- 7 -

## Issues on Appeal

On appeal, the counterclaim defendants raise several issues. First, the counterclaim defendants contend that the trial justice misconceived Frederick Sr.'s testimony regarding his reasons for bringing the lawsuit and overlooked evidence in the course of finding that the counterclaimants had proven their slander of title claim. Second, the counterclaim defendants argue that the trial justice erred in basing the amount of compensatory damages upon the diminution of the property values between 2005 and 2009 because, according to the counterclaim defendants, there was no evidence that the counterclaimants had a buyer for any of the properties or that any actual loss was incurred. Instead, the counterclaim defendants urge that, if the finding of liability is upheld, this Court should hold that the damages must be based upon the difference in the value of the properties between the time the notices of lis pendens were filed in 2002 and the time at which clear title was restored in 2009; they contend that, under this valuation method, the properties would be deemed not to have lost any value. Third, the

made a reference to the testimony of Frederick Sr., which the counterclaim defendants did not "believe" was "accurate."

The trial justice denied the motion for a new trial, stating that the counterclaim defendants "[did] not allege that there exist[ed] an error of law" at trial, but that they were instead suggesting that "[the] [c]ourt either reconsider its findings or take evidence so that the []counterclaim defendants [could] persuade the [c]ourt to change its mind." According to the trial justice, granting the counterclaim defendants' motion for a new trial would not be a "proper use of Rule 59."

The counterclaim defendants filed an amended notice of appeal, indicating that they were also appealing the denial of their new trial motion. However, in their briefs before this Court, the counterclaim defendants make no meaningful argument with respect to the denial of their motion for a new trial. As such, that issue has not been properly raised, and we shall consider it no further. See Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n. 1 (R.I. 2002) ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."); see also RBS Citizens Bank, N.A. v. Issler, 21 A.3d 293, 298-99 (R.I. 2011).

counterclaim defendants argue that the trial justice erred in awarding prejudgment interest from the date the suit was filed, rather than from the date of injury, which the trial justice found to be when the properties reached their peak market value in September of 2005. Additionally, the counterclaim defendants contend that the trial justice erred in holding Phillip, Freida, and Laurie liable for slander of title in view of the fact that they were not part of the lawsuit at the time the notices of lis pendens were filed. They further contend that the trial justice erred in finding that Frederick Sr. had the ability to pay punitive damages because the trial justice "failed to take [Frederick Sr.'s] current financial condition into account" when assessing punitive damages. (Emphasis in original.) Finally, the counterclaim defendants posit that the amount of punitive damages awarded was excessive as a matter of law.

## III

### Standard of Review

It should be borne in mind that the instant case was tried before a trial justice sitting without a jury; accordingly, we recall the basic principle of appellate jurisprudence that "[t]his Court views deferentially the factual findings of a trial justice sitting in a nonjury case." Manchester v. Pereira, 926 A.2d 1005, 1011 (R.I. 2007); see also Cahill v. Morrow, 11 A.3d 82, 86 (R.I. 2011). We are also mindful that "[i]f, as we review the record, it becomes clear to us that the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." Grady v. Narragansett Electric Co., 962 A.2d 34, 41 (R.I. 2009) (internal quotation marks omitted); see also Wellington Condominium Association v. Wellington Cove Condominium Association, 68 A.3d 594, 599 (R.I. 2013); Nardone v. Ritacco, 936 A.2d 200, 204 (R.I. 2007). Consequently, we will not disturb a trial justice's factual findings or credibility

determinations "unless they are clearly erroneous or * * * the trial justice misconceived or overlooked material evidence or * * * the decision fails to do substantial justice between the parties." Cahill, 11 A.3d at 86 (internal quotation marks omitted); see Dowdell v. Bloomquist, 847 A.2d 827, 830 (R.I. 2004); see also Banville v. Brennan, 84 A.3d 424, 429-30 (R.I. 2014); Grady, 962 A.2d at 41. We similarly afford deference to a trial justice's "resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence * * * ." Nye v. Brousseau, 992 A.2d 1002, 1008 (R.I. 2010) (internal quotation marks omitted); see also Haviland v. Simmons, 45 A.3d 1246, 1256 (R.I. 2012). In addition, "it is permissible for the trial justice to draw inferences from the testimony of witnesses, and such inferences, if reasonable, are entitled on review to the same weight as other factual determinations." Rhode Island Mobile Sportfishermen, Inc. v. Nope's Island Conservation Association, Inc., 59 A.3d 112, 118 (R.I. 2013) (internal quotation marks omitted). However, we conduct a de novo review of a trial justice's "conclusions of law." State v. Gianquitti, 22 A.3d 1161, 1165 (R.I. 2011); see Grady, 962 A.2d at 41; Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates, 763 A.2d 1005, 1007 (R.I. 2001); see also Dellagrotta v. Dellagrotta, 873 A.2d 101, 109 (R.I. 2005).

## IV

## Analysis

### A

### Slander of Title—Malice

The first issue with which we must grapple involves the tort of slander of title—a cause of action long recognized by the common law. See TXO Production Corp. v. Alliance Resources Corp., 419 S.E.2d 870, 878 (W.Va. 1992), aff'd on other grounds, 509 U.S. 443 (1993); see also

Hopkins v. Drowne, 21 R.I. 20, 20-23, 41 A. 567, 567-68 (1898) (recognizing the cause of action for slander of title). It should be emphasized that slander of title is an intentional tort, and in this case it was alleged that four separate intentional tortious acts were committed.

To prevail in a slander of title action, a plaintiff must prove by a preponderance of the evidence: "(1) that the alleged wrongdoer uttered or published a false statement about the plaintiff's ownership of real estate[;] (2) that the uttering or publishing was malicious[;] and (3) that the plaintiff suffered a pecuniary loss as a result." Beauregard v. Gouin, 66 A.3d 489, 494 (R.I. 2013); Arnold Road Realty Associates, LLC v. Tiogue Fire District, 873 A.2d 119, 126 (R.I. 2005); see Eastern Motor Inns, Inc. v. Ricci, 565 A.2d 1265, 1273 (R.I. 1989); see also 50 Am.Jur.2d Libel and Slander § 524 at 899 (2006) ("Slander or disparagement of title occurs when a party maliciously makes false statements about another party's interest in property, which then results in the owner suffering a pecuniary loss[] or special damages."). "The malice required [for a slander of title claim] is not malice in its worst sense * * * but rather an intent to deceive or injure;" malice "is established by [a] showing that a party made a false statement, with full knowledge of its falsity, for the purpose of injuring the complainant(s)." Arnold Road Realty Associates, LLC, 873 A.2d at 126 (internal quotation marks omitted); Montecalvo v. Mandarelli, 682 A.2d 918, 923 (R.I. 1996); see also Narragansett Improvement Co. v. Wheeler, 21 A.3d 430, 441 (R.I. 2011); DeLeo v. Anthony A. Nunes, Inc., 546 A.2d 1344, 1346 (R.I. 1988).

Additionally, we have noted that "express malice need not be proved * * * and may properly be inferred from the language used or the character of the act committed." Peckham v. Hirschfeld, 570 A.2d 663, 667 (R.I. 1990) (internal quotation marks omitted). In an early

opinion in which this Court recognized the cause of action for slander of title, we stated with respect to the malice requirement:

> "[T]hat it is necessary to prove it as an independent fact we do not agree. Malice is a purpose existing only in the mind, and is not ordinarily susceptible of proof as an independent fact. It is that feeling of personal hostility or ill-will towards another which only manifests itself in language or conduct, and hence is best shown by the character of the language or conduct. In other words, it naturally and legitimately springs out of and is to be inferred from such language or conduct as naturally tends to deceive, injure, and damage another, and for which there is no legal excuse." Hopkins v. Drowne, 21 R.I. 20, 23, 41 A. 567, 568 (1898); see DeLeo, 546 A.2d at 1346; see also 40 Causes of Action Slander of Title § 29 at 441 (2d ed. 2009) ("Because malice exists in the mind of the defendant, it is rarely susceptible of direct proof" therefore "the plaintiff must rely on circumstantial evidence * * * .")

It is essential to note that malice may not properly be inferred from the "mere fact that a person asserts a claim to the property that is unfounded." Peckham, 570 A.2d at 667. The "plaintiff must also show that the defendant could not honestly have believed in the existence of the right he claimed, or at least that he had no reasonable or probable cause of believing so." Id. (internal quotation marks omitted); see also Belliveau Building Corp. v. O'Coin, 763 A.2d 622, 630 (R.I. 2000) (stating that a party is privileged to "assert a property interest based upon an ultimately unfounded claim without incurring liability for slander of title—provided the party asserting the property interest did so in good faith").

On appeal, the counterclaim defendants argue that Frederick Sr. had a "colorable claim" to an interest in the properties at issue at the time that he filed the notices of lis pendens. Accordingly, the counterclaim defendants posit, the counterclaimants could not meet the required standard of proof because they could not show that Frederick Sr. acted with malice when he filed the notices of lis pendens. They contend that the counterclaimants could not show that Frederick Sr. did not have an "honest[] belief[] in the existence of the right [he] claimed" nor

- 12 -

could they prove that Frederick Sr. filed the notices of lis pendens with "full knowledge of [their] falsity" and for "the purpose of injuring" Frederick Jr.'s estate. (Internal quotation marks omitted.) The counterclaim defendants further contend that Frederick Sr. had an honest belief that he had an interest in the properties because he purportedly provided funds to purchase the properties—a fact which, the counterclaim defendants aver, "was never credibly refuted" by the counterclaimants. Moreover, the counterclaim defendants argue that the notices of lis pendens were not filed to thwart development of the properties or to harm Frederick Jr.'s estate, but rather were filed only to benefit the counterclaim defendants; on that basis, they argue that the trial justice erred when he found them liable for slander of title.

The counterclaim defendants further posit that the trial justice misconceived critical testimony when he found that "Frederick Sr. just wanted his money back on the Malbone Road property." Specifically, they argue that the trial justice erroneously determined that Frederick Sr.'s testimony with respect to his reasons for bringing suit was in reference to the money owed to him for the Malbone Road property; according to the counterclaim defendants, Frederick Sr. was actually referring to the money he allegedly contributed to the purchase of the properties at issue. Finally, the counterclaim defendants aver that the trial justice impermissibly shifted the burden of proof off the counterclaimants and onto them. With respect to the latter contention, they point to the trial justice's requirement that Frederick Sr. "produce old financial records" to support his testimony that he contributed to the purchase price of the properties at issue; they then point to the trial justice's subsequent finding that, "[a]t trial no evidence was produced that Frederick Carrozza, Sr. contributed to the purchase of any of the properties in question." The counterclaim defendants argue that the trial justice should instead have required the

counterclaimants to "disprove" Frederick Sr.'s testimony regarding the purchase of the properties at issue by showing how Frederick Jr. paid for the properties.

To rebut the arguments made by the counterclaim defendants, the counterclaimants argue that malice can be found when notices of <u>lis</u> <u>pendens</u> are filed for a reason other than claiming an interest in the property, such as to thwart development or to try to collect a debt. They contend that the evidence at trial established that the notices of <u>lis</u> <u>pendens</u> in the instant case were filed "without a good faith belief in the truth of the predicate facts and for an improper purpose, namely, to collect a debt." The counterclaimants point out in their brief that there was evidence that Frederick Jr. had access to funds by virtue of "banking relationships," personal loans, and "trading stock;" moreover, they note that the properties were all in Frederick Jr.'s name. For these reasons, the counterclaimants urge this Court to affirm the decision of the trial justice.

In a well-reasoned and thorough decision, the trial justice made forty-seven findings of fact and then proceeded to apply the law to those findings of fact, ultimately holding the counterclaim defendants liable for slander of title. He stated in pertinent part as follows:

> "The [c]ourt finds that the counterclaimants have proved by a fair preponderance of the evidence that Frederick Carrozza, Sr. not only had no good faith basis in claiming that he owned any of [the] properties [at issue], either legally or equitably, but also, as he stated in his own words in his testimony, he recorded the lis pendens not to protect a legitimate property interest but to recover money he believed to be owed to him by Frederick, Jr. and therefore he acted with legal malice, as that term is used in the context of a slander of title action."

In reaching his conclusion, the trial justice relied specifically on this Court's decisions in <u>Montecalvo v. Mandarelli</u>, 682 A.2d 918 (R.I. 1996), <u>Peckham v. Hirschfeld</u>, 570 A.2d 663 (R.I. 1990), <u>DeLeo v. Anthony A. Nunes, Inc.</u>, 546 A.2d 1344 (R.I. 1988), and <u>Hopkins v. Drowne</u>, 21 R.I. 20, 41 A. 567 (1898). The trial justice referenced the fact that Frederick Sr. gave two

separate and inconsistent accounts relative to the transfer of the Malbone Road property to Frederick Jr. The trial justice found neither account provided by Frederick Sr. to be true; rather the trial justice found that Frederick Sr. had transferred that property in order to protect it "in the event of a claim against [him] resulting from [an] * * * altercation" in which he was involved. In fact, the trial justice found that "much of the testimony at trial by [Frederick Sr.] was a knowing fabrication." The trial justice attributed Frederick Sr.'s "ill will" toward his son to Frederick Jr.'s sale of the Malbone Road property; in discussing Frederick Sr.'s "ill will" toward his son, the trial justice further referenced Frederick Sr.'s belief that Frederick Jr. had married and had adopted a daughter "to spite him." Despite his finding that Frederick Sr.'s testimony was largely not credible, the trial justice detected "one shining moment of truth"—namely, when Frederick Sr. was asked by his attorney why he filed suit and he replied: "[I]t was my money and I thought I could get it back." In reaching his final conclusion, the trial justice stated:

> "[Frederick Sr.'s] own admission and clear declaration of his motive for filing the lis pendens and the lawsuit is telling and determinative to this [c]ourt's ruling. [Frederick Sr.] did not file suit to establish and recover property rightfully his, rather he filed suit to collect a debt that he believed arose in 1998 when [Frederick Jr.] sold the Malbone property and used the proceeds to payoff [sic] a margin call resulting from [Frederick Jr.'s] disregard of his father's advice."

As this Court has previously stated, "whether * * * conduct amount[s] to malice is a question of fact." Arnold Road Realty Associates, LLC, 873 A.2d at 126. We would reiterate, before beginning our analysis of the trial justice's finding of malice in the instant case, that we give deference to the factual findings of a judge sitting without a jury. Manchester, 926 A.2d at 1011. Consequently, we will not disturb a trial justice's factual findings or credibility determinations "unless they are clearly erroneous or * * * the trial justice misconceived or overlooked material evidence or * * * the decision fails to do substantial justice between the

- 15 -

parties." Cahill, 11 A.3d at 86 (internal quotation marks omitted). We perceive nothing in the case before us which would lead us to conclude that the trial justice's findings were either clearly erroneous or misconceived or overlooked material evidence when he held that the counterclaim defendants were liable for slander of title due to the filing of the notices of lis pendens.[11]

The counterclaim defendants fault the trial justice for finding that Frederick Sr. acted with malice when he filed the notices of lis pendens at issue in this case. However, after completing a thorough review of the record, this Court is satisfied that substantial evidence exists to support the trial justice's finding that Frederick Sr. "could not honestly have believed in the existence of the right he claim[s] * * * ." Peckham, 570 A.2d at 667 (internal quotation marks omitted); see also 53 Corpus Juris Secundum Libel and Slander; Injurious Falsehood § 313 at 410 (2005) ("[A] cause of action for slander of title may arise when a false, sham, or frivolous lis pendens is filed * * * ."). The counterclaim defendants posit that Frederick Sr. did have an honest belief that he had an interest in the properties at issue because he contributed to the purchase price of those properties. This contention is simply unfounded in view of this Court's determination that the evidence "reinforce[d] [the] presumption" that the River Farm

---

[11]    We pause to note that the term lis pendens "literally means litigation or suit pending * * * ." George v. Oakhurst Realty, Inc., 414 A.2d 471, 474 (R.I. 1980). A notice of lis pendens is not a lien but "merely puts all prospective purchasers on notice that there is a suit pending involving an issue of title to the real property." Id. We have stated:

> "[H]e who purchases property pending a suit in which the title to it
> is involved, takes it subject to the judgment or decree that may be
> passed in such suit against the person from whom he purchases."
> Picerne v. Redd, 72 R.I. 4, 11, 47 A.2d 906, 910 (1946) (internal
> quotation marks omitted).

As a practical matter, the effect of the filing of a notice of lis pendens "may well be to render the property unmarketable during the pendency of the underlying dispute." Montecalvo v. Mandarelli, 682 A.2d 918, 924 (R.I. 1996).

Condominium was a gift and the finding of fact of the trial justice that Frederick Sr. did not contribute to the purchase price of any of the other three properties.[12] Carrozza, 962 A.2d at 77-78.

Moreover, the counterclaim defendants are in error when they contend that the burden of proof was somehow misapplied by the trial justice when he asked them to produce financial records to show that Frederick Sr. did contribute to the purchase price of the properties at issue. Contrary to the counterclaim defendants' contention, the burden of proof remained on the counterclaimants to show, by a preponderance of the evidence, that Frederick Sr. acted with malice because he knew he had no legitimate interest in the properties at issue when he filed the notices of lis pendens and that, accordingly, he had no "reasonable or probable cause" for filing them. Peckham, 570 A.2d at 667 (internal quotation marks omitted); see Arnold Road Realty Associates, LLC, 873 A.2d at 126. It was not clear error for the trial justice to require some

---

[12] We note that, in this Court's first opinion in this case, we recognized (as we stated in footnote 6, supra) that Frederick Sr. had testified that he had contributed to the purchase price of the Bellevue Avenue and Post Road properties. Carrozza, 962 A.2d at 77. We further held that the evidence "reinforce[d] [the] presumption" that the River Farm Condominium was a gift from Frederick Sr. to Frederick Jr.; and we noted that, by Frederick Sr.'s "own admission, he had contributed nothing to the purchase price" of the Prospect Hill Street property. Id. Subsequently, there was a trial on the counterclaimants' slander of title claim, after which the trial justice found as follows: "At trial no evidence was produced that Frederick Carrozza, Sr. contributed to the purchase of any of the properties in question."

In the first Carrozza opinion, we were reviewing the trial justice's grant of a motion for summary judgment; in view of that procedural posture, we were required to consider the evidence in the light most favorable to the nonmoving party. The nonmovants in the first Carrozza opinion were the individuals to whom we refer in the instant appeal as the counterclaim defendants (namely, Frederick Sr. and his living children). Carrozza, 962 A.2d at 77. As such, there is no conflict between our statement in the first Carrozza opinion with regard to the Bellevue Avenue and Post Road properties and the trial justice's factual findings following the trial on the counterclaimants' slander of title claim. Accordingly, we shall treat the trial justice's finding of fact that Frederick Sr. produced no evidence to show that he contributed to the purchase of the properties at issue with our usual deference. See Manchester v. Pereira, 926 A.2d 1005, 1011 (R.I. 2007); see also Grady v. Narragansett Electric Co., 962 A.2d 34, 41 (R.I. 2009).

evidence which would tend to substantiate Frederick Sr.'s claim that he had an honest belief that he possessed a legitimate interest in the properties at issue beyond Frederick Sr.'s testimony itself—especially given the trial justice's explicit finding that Frederick Sr.'s testimony was largely a "knowing fabrication." Our conclusion in this regard is reinforced by the fact that there was evidence introduced by the counterclaimants which showed that all of the properties at issue were in Frederick Jr.'s name (and only his name) at the time of his death and that, as the counterclaimants point out, Frederick Jr. had access to various sources of funding which he could have utilized for the purchase of the properties at issue. It was within the trial justice's discretion to credit the evidence showing that Frederick Jr. bought the properties on his own and to discredit Frederick Sr.'s testimony that he contributed to the purchase prices of the properties. See D'Ellena v. Town of East Greenwich, 21 A.3d 389, 392 (R.I. 2011) ("[W]e accord a substantial amount of deference to [the credibility] determinations [of a trial justice], due to the fact that the trial justice has actually observed the human drama that is part and parcel of every trial and * * * has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.") (internal quotation marks omitted); see also Hopkins, 21 R.I. at 23, 41 A. at 568 ("[Malice] is that feeling of personal hostility or ill-will towards another which only manifests itself in language or conduct, and hence is best shown by the character of the language or conduct. In other words, it naturally and legitimately springs out of and is to be inferred from such language or conduct as naturally tends to deceive, injure, and damage another * * * ."). In our judgment, there are no grounds for this Court to disturb that finding.

The counterclaim defendants also take issue with the trial justice's finding that Frederick Sr.'s testimony was largely not credible, except when he gave the following response to his own

attorney's inquiry at trial as to why he initiated the lawsuit in the first place: "It was my money and I thought I could get it back." The trial justice characterized the latter statement as a "shining moment of truth" and found that, when Frederick Sr. referred to getting his money back, he was referring to the Malbone Road property—as opposed to any of the four properties at issue in the instant case.[13] That finding contributed to the trial justice's conclusion that Frederick Sr. acted with malice when he filed the notices of lis pendens. The counterclaim defendants argue that Frederick Sr.'s statement about getting his money back was in fact a reference to the money he allegedly contributed to the purchase prices of the four properties in this case. However, the counterclaim defendants are unable to point to any definitive evidence to support that assertion; they direct this Court's attention only to portions of Frederick Sr.'s testimony immediately before and after the above-quoted comment about getting his money back. The testimony which precedes and follows Frederick Sr.'s somewhat fog-shrouded reference to getting his money back does not provide enlightenment as to the property to which Frederick Sr. was referring. However, it was within the trial justice's discretion to infer from that testimony that Frederick Sr. was referring to the Malbone Road property and, accordingly, to find that he acted with malice when he filed the notices of lis pendens. See Peckham, 570 A.2d at 667. After carefully scrutinizing the record, we do not perceive anything in Frederick Sr.'s testimony that would lead us to rule that the trial justice was clearly wrong in his credibility determination. Moreover, the trial justice understandably accorded Frederick Sr.'s statement about getting his money back a great deal of attention; his credibility determination is entitled to deference from this Court. See

---

[13] The trial justice further found that Frederick Sr. had given two different accounts about the sale of the Malbone Road property and that he had not been candid about the reason he transferred that property to Frederick Jr. in the first place. These factual findings also add weight to the trial justice's determination that Frederick Sr.'s testimony was not credible and that he acted with malice when he filed the notices of lis pendens.

- 19 -

Manchester, 926 A.2d at 1011; see also State v. Ferreira, 21 A.3d 355, 367 (R.I. 2011) (looking at a trial justice's "credibility determinations through a prism of deference") (internal quotation marks omitted). Accordingly, this Court holds that the trial justice did not misconceive Frederick Sr.'s testimony.

Finally, the counterclaim defendants argue that the trial justice erred when he found that Frederick Sr. acted with malice because: (1) Frederick Sr. did not file the notices of lis pendens to "thwart development;" and (2) Frederick Sr.'s motive in filing the notices of lis pendens was not to injure Frederick Jr.'s estate, but rather was to benefit the counterclaim defendants. According to the counterclaim defendants, in view of the fact that there was no allegation that Frederick Sr.'s purpose in filing the notices of lis pendens was to thwart development, the trial justice's reliance on this Court's opinions in Montecalvo v. Mandarelli, 682 A.2d 918 (R.I. 1996), and DeLeo v. Anthony A. Nunes, Inc., 546 A.2d 1344 (R.I. 1988), was in error. The counterclaim defendants are correct that in DeLeo this Court determined that filing a notice of lis pendens with the purpose of (in the trial justice's language) "thwart[ing] the development of the property" was malicious. See DeLeo, 546 A.2d at 1346-47. However, neither our decision in DeLeo nor our decision in Montecalvo stands for the proposition that malice can be proven only by showing that the party who filed the notice of lis pendens did so in order "to thwart the development of the property." See id.; see also Montecalvo, 682 A.2d at 923-25. In fact, in Montecalvo, where we upheld a finding by the trial justice that the plaintiff acted maliciously because, when filing the lis pendens, she was merely attempting to recoup an alleged debt, we expressly stated that "a lis pendens may not be used as a substitute for an attachment to collect an alleged indebtedness." Montecalvo, 682 A.2d at 925; see also Countrywide Home Loans, Inc. v. Howard, 240 S.W.3d 1, 4 (Tex. App. 2007) ("If the suit seeks a property interest only to secure

the recovery of damages or other relief that the plaintiff may be awarded, the interest is merely collateral and will not support a lis pendens."). It was the trial justice's determination that that was precisely what Frederick Sr. did in this case, and we perceive no clear error in that determination. Moreover, the counterclaim defendants' attempt to circumvent the malice issue by claiming that Frederick Sr. could not have acted with malice when he filed the notice of <u>lis pendens</u> because he sought only to help himself and not to harm Frederick Jr.'s estate is a distinction without a difference. <u>See</u> <u>Arnold Road Realty Associates, LLC</u>, 873 A.2d at 126 (stating that malice is "established by showing that a party made a false statement, with full knowledge of its falsity, for the purpose of injuring the complainant(s)") (internal quotation marks omitted). Consequently, the counterclaim defendants' contentions are unavailing; there is nothing in our review of the record which would lead us to conclude that the trial justice committed clear error or misconceived or overlooked material evidence in holding that the counterclaim defendants were liable for slander of title.

## B

### Slander of Title—Damages

### 1. Compensatory Damages

The first contention with respect to damages which the counterclaim defendants raise is that the trial justice used an inappropriate method of calculating the compensatory damages in this case. In addressing the counterclaim defendants' argument, we find it helpful to begin by discussing how the trial justice awarded damages.

The trial justice made findings of fact with respect to the change in value of the four properties at issue during the time period in which they were subject to the notices of <u>lis</u> <u>pendens</u>. The trial justice's findings of fact as to the value of the properties were derived from the

testimony of Mr. Hogan, a real estate appraiser. Mr. Hogan testified that the value of the property located at Bellevue Avenue in Newport was $1,835,000 in February of 2009, when the notices of lis pendens were removed, and $2,310,000 at its highest value, in September of 2005. According to Mr. Hogan's testimony, the value of the property located at Prospect Hill Street in Newport was $200,000 in February of 2009 and $250,000 at its highest value, in September of 2005; he added that the value of the property located on Post Road in Warwick was $320,000 in 2009 and $365,000 at its highest value in 2005. Finally, Mr. Hogan testified that the value of the River Farm Condominium located in West Warwick was $280,000 in February of 2009 and $340,000 at its highest value in 2005.

In order to determine the damages, the trial justice subtracted the value of the properties at the point in time when the notices of lis pendens were removed from their value at the time when the properties were at their highest value during the period in which they were subject to the notices of lis pendens. Using this formula he found that: (1) the Bellevue Avenue property had declined in value by $475,000; (2) the Prospect Hill Street property declined in value by $50,000; (3) the Post Road property declined in value by $45,000;[14] and (4) the River Farm Condominium declined in value by $60,000. Adding those numbers together, the trial justice arrived at a grand total of $630,000 in compensatory damages.[15]

---

[14]  We note that, in his findings of fact, the trial justice correctly articulated the values of the properties, as testified to by Mr. Hogan. However, when actually calculating the damages, he mistakenly stated that the February 2009 value of the Post Road property was $280,000 (instead of the correct value of $320,000), leading him to conclude that the damages should amount to $670,000. That discrepancy was corrected before a judgment was entered, and the judgment reflects the correct total of compensatory damages ($630,000).

[15]  The trial justice also awarded legal fees and expenses. He found the total legal fees to amount to $350,000—which amount he then "adjusted to reflect the legal fee structure in Rhode Island" and reduced the award to $151,267 plus expenses of $24,080.40. The legal fees and expenses that the trial justice awarded are not at issue in this appeal.

On appeal, the counterclaim defendants contend that the trial justice should have calculated damages by comparing the value of the properties on the date the notices of lis pendens were filed (November 15, 2002) and the date they were removed (February 2, 2009). They point out that little evidence was submitted regarding the value of the properties on the date the notices of lis pendens were filed, but that what was elicited as to that issue in the cross-examination of Mr. Hogan indicated that the value was comparable to the value on the date the notices of lis pendens were removed. Thus, according to the counterclaim defendants, the counterclaimants failed to prove, as they were required to do, that they suffered any special damages or pecuniary loss. The counterclaim defendants argue that it would only be appropriate to calculate damages by comparing the highest value of the properties with their value when the notices of lis pendens were removed if there had been a "ready, willing, and able buyer[]." And they note that the trial justice found that the testimony of the only interested buyer was not credible and that the buyer had merely been engaging in "tire-kicking." The counterclaim defendants further support their argument by pointing out that the counterclaimants enjoyed the profits of continued ownership of the properties (receiving rental income, for example) for the entire period during which they were subject to the notices of lis pendens.

The counterclaimants contend in their brief that it is "disingenuous" of the counterclaim defendants, "having employed every legal stratagem and tactic they could muster to prevent the [counterclaimants] from selling the properties, [to] now argue there was no real effort to sell the properties."[16] (Internal quotation marks omitted.) They contend that the title to the properties

---

[16] The counterclaimants initially contend that the counterclaim defendants waived any right to challenge the mode of calculating compensatory damages because they never "objected to the expertise of the damages expert, or his method of calculating damages, or the conclusions he offered in his testimony." See ADP Marshall, Inc. v. Brown University, 784 A.2d 309, 312 (R.I. 2001) ("According to our well-settled raise or waive rule, issues that present themselves at trial

was rendered unmarketable by the notices of lis pendens and that, consequently, they should not be faulted for failing to sell unmarketable properties. In support of their argument, they direct this Court's attention to the testimony of Attorney Michael Voccola (the executor of the estate of Frederick Jr.), who stated that he saw "no reason to go through the motions" of attempting to sell any of the properties when he could not "provide a clean, marketable and insurable title." The counterclaimants argue that, as a result of the fact that the filing of the notices of lis pendens had rendered each of the properties unmarketable, they were not able to take advantage of rising market conditions in 2005. Moreover, they deem it important for this Court to bear in mind that the counterclaim defendants "thwarted" all attempts to quash the notices of lis pendens throughout the course of the proceedings in Superior Court, even after summary judgment had been awarded in the counterclaimants' favor.

We note that determining the appropriate method to be used in calculating damages (as opposed to determining the amount of damages after the process of weighing the evidence and making credibility determinations) is a question of law; as such, we shall address that issue in a de novo manner. See Gianquitti, 22 A.3d at 1165.

In order to prevail on a slander of title claim, a plaintiff must necessarily prove that he or she has sustained an "actual pecuniary loss." Peckham, 570 A.2d at 666-67 (internal quotation

---

and that are not preserved by a specific objection at trial, sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.") (internal quotation marks omitted). The counterclaim defendants respond by arguing that they challenged the theory of valuation during their cross-examination of Mr. Hogan, in their post-trial memorandum, and in their "Motion for a New Trial or, in the Alternative, to Alter or Amend the Judgment under Rule 59." Additionally, they state that Mr. Hogan testified only as to the value of the properties, not the method of calculating damages—so that any failure to object to Mr. Hogan's testimony was not a waiver with respect to the issue of calculating the compensatory damages. We are in agreement with the counterclaim defendants. The record is clear that they challenged the method of calculating damages below and, accordingly, we shall address their contention that that method was inappropriate.

- 24 -

marks omitted); see also Wheeler, 21 A.3d at 441; Keystone Elevator Co. v. Johnson & Wales University, 850 A.2d 912, 923 (R.I. 2004). Unlike damages recoverable in most other causes of action, without proof that special damages (i.e., a pecuniary loss) were incurred, "a prima facie case of slander of title will not be made." 40 Causes of Action Slander of Title § 13 at 421 (2d ed. 2009). Consequently, in order for counterclaimants to prove their slander of title claim, they were required to show that they incurred an actual injury as a result of the filing of the notices of lis pendens. The parties do not dispute that such an injury is required for damages to be awarded in a slander of title action; rather, they dispute how such an injury should be measured when determining whether it is sufficient to meet the requirement of special damages. Succinctly put, the counterclaim defendants are contending that any pecuniary loss based on the change in fair market value of the properties should be calculated by comparing the value of the properties on the date when the notices of lis pendens were filed with their value on the date when they were removed, unless there was evidence that a buyer existed who refused to purchase the property due to the notices of lis pendens; only in the latter situation, according to the counterclaim defendants, may a court calculate damages by looking to a date other than the date of filing and the date of removal of the notices of lis pendens.

After carefully reviewing the record in this case, it is our judgment that, in the context of this slander of title claim, the trial justice's method of calculating damages was appropriate and, in contrast with the counterclaim defendants' proposed system of calculating damages, properly accounted for the real harm suffered by the counterclaimants.[17] We begin by noting that "[t]he

---

[17] We are aware that some jurisdictions use the method of calculating pecuniary loss advocated by the counterclaim defendants. See, e.g., FCD Development, LLC v. South Florida Sports Committee, Inc., 37 So.3d 905, 909 (Fla. Dist. Ct. App. 2010) ("We have recognized the proper method of measuring damages for wrongful filing of lis pendens as the difference between the fair market value at the time of the filing of the lis pendens and the fair market value

- 25 -

thrust of the tort of * * * slander of title is protection from injury to the salability of property." Truck Insurance Exchange v. Bennett, 61 Cal. Rptr. 2d 497, 503 (Cal. Ct. App. 1997). As such, "pecuniary loss in this context includes that from the impairment of vendibility or value by the disparagement * * * ." Rite Aid Corp. v. Lake Shore Investors, 471 A.2d 735, 742 (Md. 1984); see also 53 Corpus Juris Secundum Libel and Slander; Injurious Falsehood § 321 at 418 (2005) ("Special damages may be demonstrated by proof that the defendant's disparagement interrupted, or injuriously affected, some dealing of the plaintiff with his or her property."). Such a pecuniary loss "may exist even where no purchaser is involved, as where the plaintiff is harmed by a loss of value to the property." 53 Corpus Juris Secundum Libel and Slander; Injurious Falsehood § 321 at 419 (2005); see also Appel v. Burman, 206 Cal. Rptr. 259, 263 (Cal. Ct. App. 1984) ("[I]t is clear in California that a slander of title can result where no purchaser is present."); Bonnie Braes Farms, Inc. v. Robinson, 598 S.W.2d 765, 766 (Ky. Ct. App. 1980) ("The special damage required [for a slander of title action] may consist of either a loss by the plaintiff of a sale of his property or a diminution in its fair market value."). Although in some jurisdictions it "may be necessary for the plaintiff to prove that the sale of the property to a specific individual or individuals was frustrated by the defendant's statements[,] * * * [m]ore typically * * * the plaintiff will have to prove only that the general vendibility of the property was impaired." 40 Causes of Action Slander of Title § 13 at 422 (2d ed. 2009).

---

at the time of its termination, plus any consequential damages, including attorney's fees.") (internal quotation marks omitted); see also 50 Am.Jur.2d Libel and Slander § 536 at 915 (2006) ("The damages awardable for the wrongful filing of a lis pendens against the subject property may be measured by the difference between the fair market value of the property on the date the lis pendens is filed and the fair market value at the time the lis pendens is terminated.").

We are in complete agreement that, in a slander of title action like the one before us, the party bringing the slander of title claim need not show that he or she had a specific purchaser for the property in order for the damages to be calculated from the date the properties involved in the case were at their highest value during the time period when the properties were subject to the notices of lis pendens. In the instant case, if we were to follow the counterclaim defendants' suggestion and use the date the notices of lis pendens were filed as the start date to determine damages, it would lead to a true inequity—namely, the quite likely[18] result of no pecuniary loss being incurred by the counterclaimants in spite of the fact that the counterclaimants were most probably rendered unable to sell or refinance their property for a period of approximately seven years solely due to the malicious acts of the counterclaim defendants.[19] We decline to follow a method of calculating damages that could result in such inequity.[20]

---

[18]    We would note that, if we were to follow the counterclaim defendants' proposed method of calculating damages, it is likely that that method would result in no pecuniary loss being incurred because, as the counterclaim defendants indicate, there was little evidence presented regarding the value of the properties on the date the notices of lis pendens were filed.

[19]    In our opinion in Montecalvo v. Mandarelli, 682 A.2d 918, 930 (R.I. 1996), a slander of title case, we held that evidence at trial suggesting that the property at issue had diminished in value by anywhere from $40,000 to $180,000 from the time the lis pendens was recorded to the time of trial was sufficient to hold that the jury's determination of a loss in value of $50,000 was reasonably supported by the evidence. Although the damages in Montecalvo appear to have been based on a comparison of the value of the property at the time the notice of lis pendens was filed and the value at the time of trial, we did not expressly endorse such a method of calculating damages in a slander of title case. Rather, we simply held that the jury's determination of damages was reasonably supported by the evidence that the property at issue had changed in value from the date the notice of lis pendens was filed and the date of the trial.
        Moreover, in Montecalvo we were tasked with determining whether the plaintiff's motion for a new trial on the grounds that the defendant had failed to prove damages, was properly denied by the trial justice. Montecalvo, 682 A.2d at 929. The analysis required in that context is very different from what is required in the instant case. In this case, we must determine the proper method of calculating pecuniary loss in a slander of title action—whereas in Montecalvo we were called upon to determine whether the trial justice's denial of the plaintiff's motion for a new trial was clearly erroneous. See Yi Gu v. Rhode Island Public Transit Authority, 38 A.3d

- 27 -

Our confidence in our conclusion that the trial justice's method for calculating pecuniary loss in this case was not erroneous is reinforced by our awareness of the fact that the counterclaim defendants committed an intentional tort which required the counterclaimants to show malice on the part of the counterclaim defendants—a not insignificant requirement, which the counterclaimants were able to meet. See Arnold Road Realty Associates, LLC v. Tiogue Fire District, 873 A.2d 119, 126 (R.I. 2005) (stating that the malice required for a slander of title claim is "an intent to deceive or injure") (internal quotation marks omitted); Montecalvo v. Mandarelli, 682 A.2d 918, 923 (R.I. 1996) (stating that, to show malice in a slander of title action, it must be proven that "a party made a false statement, with full knowledge of its falsity, for the purpose of injuring the complainant(s)"). Moreover, our confidence in our decision is further buttressed by the fact that the counterclaimants were in fact injured. The striking metaphorical language employed by the trial justice in addressing the issue of compensatory damages is noteworthy; in rendering his bench decision, he stated that "the properties were held hostage by the lis pendens." (Emphasis added.) Typically, "the purpose of a remedy is * * * to place the person in the position the person would have occupied had the wrong not occurred." James M. Fischer, The Puzzle of the Actual Injury Requirement for Damages, 42 Loy. L.A. L. Rev. 197, 197, 198 (2008) ("With the award, the person's position, from a balance sheet perspective, is the same as if the person had not been injured in the first place.") (internal

1093, 1099 (R.I. 2012). Therefore, we perceive no inconsistency between our opinion in Montecalvo and our holding in the instant case.

[20]    We strive always to be mindful of and guided by the memorable ancient maxim that declares: "Lex nemini operator iniquum, nemini facit injuriam." 2 Bouvier's Law Dictionary, 2143 (8th ed. 1914). (That Latin maxim can be translated as: The law will not work an inequity upon anyone, nor will it do injury to any person.) The approach advocated by the counterclaim defendants is entirely inconsistent with that venerable and fundamental principle of Western jurisprudence.

quotation marks omitted). If the notices of <u>lis</u> <u>pendens</u> had not been filed, the counterclaimants in this case would have been able to freely decide what to do with the properties—whether it was to sell the properties, refinance, or give the properties as gifts. The counterclaim defendants' filing of the notices of <u>lis</u> <u>pendens</u> effectively took those opportunities off the table for a long period of time. We hold, therefore, that, in this case, in order to remedy the harm caused to the counterclaimants while their property was "held hostage" by the malicious acts of the counterclaim defendants, the trial justice appropriately ruled that the counterclaimants suffered an actual pecuniary loss which was to be calculated by comparing the highest value of the properties during the time period they were subject to the notices of <u>lis</u> <u>pendens</u> with the value of the properties on the date the notices of <u>lis</u> <u>pendens</u> were removed.

We also deem it worth noting that, if we were to agree with the counterclaim defendants' proposed method of determining pecuniary loss in a slander of title action, we would create a situation whereby the owner of a property encumbered by a notice of <u>lis</u> <u>pendens</u> would be placed in the position of having to constantly attempt to sell a property even though he or she could not provide a clear marketable title. If the owner would be entitled to determine his or her pecuniary loss starting from the date the property had its highest market value while subject to the notice of <u>lis</u> <u>pendens</u> only if he or she had a prospective buyer at that time, an astute owner interested in receiving their full measure of damages in a slander of title action would have to continuously look for buyers. As Attorney Voccola testified at trial, it is a fruitless endeavor to attempt to sell a property with a cloud on its title.[21] We decline the counterclaim defendants' invitation to reach such an absurd result. <u>Cf.</u> <u>Kingston Hill Academy v. Chariho Regional</u>

---

[21] In his testimony, Attorney Voccola stated that there was "no reason to go through the motions" of selling the properties since he was "unable to provide clean, marketable and insurable title" due to the notices of <u>lis</u> <u>pendens</u>.

School District, 21 A.3d 264, 273 (R.I. 2011) (noting that to decide the case another way "would effect an absurd result") (internal quotation marks omitted).

Accordingly, we hold that, the trial justice in this case did not err in the method he employed to determine whether there had been a pecuniary loss necessary for a slander of title action—namely, by comparing the fair market value of the properties at the time they reached their highest value during the period they were subject to the notices of lis pendens with the fair market value of the properties at the time the notices of lis pendens were removed, regardless of whether there was evidence of a "ready, willing, and able" buyer.

### 2. Prejudgment Interest[22]

The trial justice, in awarding damages on the slander of title claim, ruled that the counterclaimants were entitled to prejudgment interest to be calculated from November 15, 2002—the date on which the notices of lis pendens were filed. In support of his award the trial justice relied on G.L. 1956 § 9-21-10.[23]

---

[22] Although we recognize that prejudgment interest is technically not an element of damages, we shall discuss it in this section of the opinion (entitled "**Slander of Title— Damages**") simply because it, like the other subsections under the just-referenced heading, relates to the total amount that in the end will be payable to the counterclaimants. See DiMeo v. Philbin, 502 A.2d 825, 826 (R.I. 1986).

[23] The counterclaim defendants initially contend that the counterclaimants have conceded that the prejudgment interest awarded by the trial justice should have been awarded from September of 2005 (the date when the properties at issue reached their highest value during the time period when they were subject to the notices of lis pendens), rather than November 15, 2002 (the date on which the notices of lis pendens were filed). Our review of the counterclaimants' pre-briefing statement, filed pursuant to Article I, Rule 12(A) of the Supreme Court Rules of Appellate Procedure, does confirm that the counterclaimants appear to concede that the trial justice's start date, with respect to the award of prejudgment interest, was erroneous: "The appellees acknowledge that the date from which prejudgment interest accrues should be September 30, 2005."

We have held: (1) that arguments raised in a pre-briefing statement but not reiterated in the full brief are waived; and (2) that the failure to raise an issue in a pre-briefing statement does not waive that issue for full briefing. See State v. Rolon, 45 A.3d 518, 519 n. 1 (R.I. 2012); Bowen Court Associates v. Ernst & Young LLP, 818 A.2d 721, 728-29 (R.I. 2003). However,

It is the contention of the counterclaim defendants that the award was in error. They argue that the trial justice should have awarded prejudgment interest starting from the date the properties reached their highest value during the time in which they were subjected to the notices of lis pendens—viz., September of 2005. The counterclaim defendants point to the fact that the trial justice awarded compensatory damages focusing on the date the properties reached their highest value, and they argue that prejudgment interest should have been calculated accordingly. Not surprisingly, the counterclaimants contend that the trial justice was correct in his reliance on § 9-21-10 and in ruling that prejudgment interest began to accrue on the date when the notices of lis pendens were filed.

Section 9-21-10(a) reads, in pertinent part, as follows:

> "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein." (Emphasis added.)

As the counterclaimants point out, the statute expressly requires prejudgment interest to accrue "from the date the cause of action accrued." As discussed in Part IV.B.1, supra, the properties at issue in this case were (in the particularly apt words of the trial justice) "held hostage" by the counterclaim defendants from the moment the notices of lis pendens were filed. Consequently, a

contrary to the argument of the counterclaim defendants, it does not follow from our previous holdings that the counterclaimants in this case waived any right to argue in favor of the trial justice's award of prejudgment interest in their full brief. Rather, it is a logical extrapolation from our just-referenced case law to state that, if the failure of an appellant to raise an issue in his or her pre-briefing statement does not waive his or her right to raise it at full briefing, then the concession of a point by an appellee in his or her pre-briefing statement does not preclude the appellee from raising the issue at the time of full briefing. Moreover, the counterclaim defendants in this case had ample opportunity to respond to any argument made by the counterclaimants with respect to prejudgment interest—namely, by addressing such argument in their reply brief. See Bowen Court Associates, 818 A.2d at 729. Thus, we do not deem the fact that there is language in the counterclaimants pre-briefing statement seemingly conceding that prejudgment interest should accrue from September of 2005 to be determinative.

cause of action for slander of title accrued at the moment the notices of lis pendens were filed; as such, we hold that § 9-21-10(a) controls and prejudgment interest accrued from November 15, 2002.[24] See Metropolitan Property and Casualty Insurance Co. v. Barry, 892 A.2d 915, 924 (R.I. 2006) (holding, in the context of an arbitration regarding an individual's claim for uninsured motorist benefits, that prejudgment interest accrued from the date of injury); see also Buckley v. Brown Plastics Machinery, LLC, 368 F. Supp. 2d 167, 172-73 (D.R.I. 2005) (holding that, in a case dealing with a demand for performance on a contract and applying § 9-21-10, the date of accrual of the cause of action was the date the action was filed). Consequently, we affirm the holding of the trial justice.

### 3. Punitive Damages

As was previously noted, the trial justice awarded $630,000 in compensatory damages, along with $151,267 in legal fees, $24,080.40 in expenses, as well as prejudgment interest running from November 15, 2002 against all of the counterclaim defendants, whereas he awarded $845,000 in punitive damages against Frederick Sr. alone.

With respect to punitive damages the trial justice found that "this is the rare case where punitive damages are justified." He set forth his reasons for that finding as follows:

> "[P]unitive damages are justified in light of the following factors: Frederick, Sr.'s admission that he lied under oath when he claimed ownership of the four properties and, as the [c]ourt found, that most of his testimony was not worthy of belief. The [c]ourt is also

---

[24] Our holding with respect to prejudgment interest in the instant case is consistent with our opinion in DiMeo, 502 A.2d at 826. In that opinion we stated that prejudgment interest is "not an element of damages," but rather "it is purely statutory and is peremptorily added to the jury verdict by the clerk of the court." Id. Moreover, with reference to § 9-21-10, we expressly indicated as follows: "[That] section directing the addition of prejudgment interest is neither ambiguous nor equivocal. It speaks imperatively and directly not to the court but to the clerk * * * . This is a purely ministerial act; it contemplates no judicial intervention." Id. (internal quotation marks omitted).

taking into account prevarications on the witness stand and throughout the course of the prosecution of the case itself, including [the] filing of affidavit and the like. Also, the [c]ourt finds and takes into account the failure of [Frederick Sr.] to commence a civil action against [Frederick Jr.] while he was still alive. Also the [c]ourt takes into account the number and variety of what I found to be baseless claims, including partnership, breach of confidential relationship, express trust, implied trust, resulting trust, also the [counterclaim defendants'] refusal throughout the course of the litigation to discharge the lis pendens. Also, the [c]ourt considers the assertion of the claims only after [Frederick Jr.'s] lips were sealed by death, and as I stated, the tenacity in pursuing the claims despite total lack of proof and absence of other documentary evidence. Also, the [c]ourt considers the [counterclaim defendants'] improper motive to collect many times over a debt that [Frederick Sr.] allegedly believed was due from [Frederick Jr.], the visiting of harm not upon [Frederick Jr.] but upon his widow and adopted daughter who were deprived of their rightful inheritance for more than seven years and also the [counterclaim defendants'] admittedly perjurious assertion of their claims and the evidence that the [counterclaim defendants] were motivated by ill will fed by a reservoir of hostility against [Frederick Jr.] and against the widow and daughter whom [Frederick Sr.] believed [Frederick Jr.] had married, as to the widow, in violation of his promise to him and that [Frederick Jr.] had adopted the daughter to spite [Frederick Sr.]."

The trial justice concluded that all of the reasons articulated in the just-quoted passage, when considered in the aggregate, justified an award of punitive damages; and he cited to this Court's opinions in Peckham, 570 A.2d at 669 and DeLeo, 546 A.2d at 1348.

The trial justice proceeded to take into account Frederick Sr.'s ability to pay punitive damages. He noted that Frederick Sr. testified that: (1) he had "acquired wealth over his lifetime;" (2) that he owned a business called "Coin-o-Matic;" (3) that all of Frederick Jr.'s money "came from him;" and (4) that Frederick Sr. and Frederick Jr. had "money on the street"[25] and had other investments as well—including ownership of stocks such as Oxford Healthcare,

---

[25] The Urban Dictionary defines "put money on the street" as follows: "It means to loan or give money to other people and businesses." The Urban Dictionary, http://www.urbandictionary .com/define.php?term=put+money+on+the+street (last visited May 14, 2014).

which Frederick Sr. sold for a profit (which the trial justice stated had also been testified to by "the investment banker and the accountant"). The trial justice additionally noted that Frederick Sr. testified on cross-examination that he owned real estate such as "the property at the Point Judith lighthouse," a house on Ocean Road in Narragansett, and a house in Coventry "with a substantial amount of acreage – I think the figure was 80 acres – all of which was developable." The trial justice concluded by finding that the counterclaimants had proven that an award of punitive damages was justified, and he awarded punitive damages in the amount of $845,000 against Frederick Sr.

Rhode Island recognized punitive damages "as far back as 1890 [in] Kenyon v. Cameron, 17 R.I. 122, 20 A. 233 (1890) * * * ."[26] Greater Providence Deposit Corp. v. Jenison, 485 A.2d 1242, 1244 (R.I. 1984). Punitive damages are awarded, not to compensate a plaintiff for his or her injuries, but rather to "punish the offender and to deter future misconduct." Id.; see also Palmisano v. Toth, 624 A.2d 314, 318 (R.I. 1993); DeLeo v. Anthony A. Nunes, 546 A.2d 1344, 1348 (R.I. 1988); Exemplary Damages in the Law of Torts, 70 Harv. L. Rev. 517, 522 (1957) ("As a purpose of exemplary damages, punishing the defendant is closely related to the purpose of deterring him and others from further offenses.") (internal quotation marks omitted).[27] We have consistently held that "punitive damages are proper only in situations in which the defendant's actions are so willful, reckless, or wicked that they amount to criminality"[28] and that

---

[26]    We note that punitive damages have "been in existence since the Code of Hammurabi in 2000 B.C.;" we refer the reader to a fascinating and exhaustive history of punitive damages in Linda L. Schlueter, The History of Punitive Damages, 1 Punitive Damages ch. 1, § 1.0 at 1 (5th ed. 2005).

[27]    Punitive damages are also known as exemplary damages. See Exemplary Damages in the Law of Torts, 70 Harv. L. Rev. 517 (1957).

[28]    "Such willfulness, recklessness or wickedness has been held to be found in torts involving maliciousness, wantonness or willfulness." Sherman v. McDermott, 114 R.I. 107, 109,

the question of whether adequate facts exist to meet that standard and support an award of punitive damages is a question of law, which this Court reviews de novo. Jenison, 485 A.2d at 1244; see Sherman v. McDermott, 114 R.I. 107, 108, 329 A.2d 195, 196 (1974); Pharmacy Services, Inc. v. Swarovski North America Ltd., No. 04-72-T, 2006 WL 753055, at * 6 (D.R.I. Mar. 21, 2006); see also Palmisano, 624 A.2d at 318 ("An award of punitive damages is considered an extraordinary sanction and is disfavored in the law, but it will be permitted if awarded with great caution and within narrow limits."). However, in the instant case, Frederick Sr. does not challenge the finding of the trial justice that this is a case in which an award of punitive damages is appropriate. Instead, Frederick Sr. contends only: (1) that the trial justice misconceived the evidence when assessing his ability to pay; and (2) that the award of punitive damages was excessive. We are mindful, however, that such determinations are confided to the sound discretion of the trial justice, and we will not alter a ruling absent convincing evidence of an abuse of that discretion. Jenison, 485 A.2d at 1244 ("Once the court has determined the case to be a proper one for punitive damages, whether the plaintiff is entitled to such an award is discretionary upon the finder of fact."); see Sherman, 114 R.I. at 108-09, 329 A.2d at 196.

### i. Frederick Sr.'s Ability to Pay

Frederick Sr.'s first contention with respect to the trial justice's award of punitive damages is that the trial justice inaccurately assessed his ability to pay. Frederick Sr. alleges that, once a trial justice decides to consider the ability of a defendant to pay punitive damages, "his award cannot withstand appeal if it is based [on] a misconception of the evidence." Accordingly, Frederick Sr. avers that the award of punitive damages in the instant case was based upon a misconception of the evidence, which he says resulted from the trial justice's

---

329 A.2d 195, 196-97 (1974) (internal quotation marks omitted); see also Peckham v. Hirschfeld, 570 A.2d 663, 668-69 (R.I. 1990).

- 35 -

reliance on financial information which was "outdated and incorrect." Specifically, he alleges: (1) that, contrary to the trial justice's finding, there was no evidence that he was "in the business of" privately lending money; (2) that the trial justice relied upon business activity and property ownership evidence that was "decades old;" (3) that the trial justice's belief that Frederick Sr. was in possession of "70 acres of developable land in Coventry" was unfounded; (4) that the trial justice erred when he referenced Frederick Sr.'s ownership of property at the Point Judith Lighthouse since that property had been "optioned" in 1984; (5) that, contrary to the trial justice's finding, any interest which Frederick Sr. possessed in the business called "Coin-o-Matic" or the property which housed its base of operations had been transferred to Frederick Jr.; and (6) that "the trial justice noted that Frederick Sr. made money on the stock market but failed to note that Frederick Jr. had taken $60,000 of Frederick Sr.'s stock money." Frederick Sr. posits that "[a]ll in all, the evidence at trial demonstrated that Frederick Sr. is retired, gave away his interest in the Atwells Avenue property where his business was located, and transferred virtually all of his real estate to Frederick Jr. during the latter's lifetime."

The counterclaimants remind us that any findings by the trial justice with respect to credibility or the weight of the evidence are entitled to deference, and they point to the fact that the trial justice found Frederick Sr.'s testimony to be largely a "knowing fabrication." They further point out that in this case "[t]he trial Justice was not carried away by passion or prejudice." Moreover, the counterclaimants direct our attention to the fact that the trial justice was aware of the law with respect to punitive damages in Rhode Island since he cited to both Peckham, 570 A.2d at 663 and DeLeo, 546 A.2d at 1344. They further contend that there was sufficient evidence to support the trial justice's determination that Frederick Sr. was able to pay the punitive damages awarded; they note that, even though Frederick Sr. had the opportunity to

submit evidence about his then-current financial situation, he chose not to avail himself of that opportunity.

Our precedent in this area of the law is clear; we have held that proof of ability to pay is not "a condition precedent" for the awarding of punitive damages. Sherman, 114 R.I. at 110, 329 A.2d at 197. We have specifically dealt with the issue on numerous occasions, but our opinions in Castellucci v. Battista, 847 A.2d 243 (R.I. 2004), and Greater Providence Deposit Corp. v. Jenison, 485 A.2d 1242 (R.I. 1984), are particularly on point. In Jenison, one of the defendants contended that it was error for the trial justice to award punitive damages without taking into account his ability to pay. Jenison, 485 A.2d at 1244. We rejected that contention and stated that "logic demand[s] that a defendant carr[ies] the burden of showing his modest means, facts particularly within his power, if he wants this matter considered in mitigation of damages." Id. at 1245. We proceeded to hold that the defendant had been aware that punitive damages were being sought and still failed to introduce any evidence with respect to his inability to pay and that therefore, "he should [not] now be heard to complain about [his] absence or paucity." Id.

The defendant in Castellucci, like the defendant in Jenison, contended "that a plaintiff should be required to present a threshold amount of evidence about a defendant's financial status as a condition precedent to an award of punitive damages or that a plaintiff's failure to offer such evidence precludes the need for the defendant to mitigate the damages with his own presentation of evidence." Castellucci, 847 A.2d at 246. Again, as in Jenison, we rejected the defendant's argument. Id. We stated that, although plaintiffs must show that the actions of defendants merit punitive damages, "our law does not require a further demonstration of the depth of the reservoir from which resources could be drawn to satisfy a punitive damage award." Id. at 246-47, 247

(stating that our law on the issue of proof of a defendant's ability to pay punitive damages was "clear" and that we "decline[d] defendant's invitation to change it"). We proceeded to hold that it was the defendant's obligation to present evidence of his financial condition if he hoped to reduce the punitive damages award; "a defendant need not sit idly by, fated to pay a punitive award based strictly on what the fact-finder discerns solely from plaintiff's presentation of the case." Id. at 247. It was our judgment that, "[b]y not coming forward with evidence of his financial means, defendant either took a risk or made a tactical decision that did not bear fruit." Id. at 248.

We perceive no difference between the case before us and Jenison or Castellucci. The counterclaimants had no duty to present evidence of Frederick Sr.'s ability to pay; rather, Frederick Sr. had the duty to present evidence that would tend to demonstrate his inability to satisfy a punitive damages award. He made a choice not to present any convincing evidence of what he contends were his empty pockets. Accordingly, we find ourselves in complete agreement with the following statement made by the counterclaimants in their brief:

> "Fred Sr. chose not to offer evidence of his current financial condition. He made a tactical decision that evidence of his wealth was helpful to his theory of the case: that he, Fred Sr., was the source of everything Fred Jr. accumulated over the course of his life and, in particular the source of the money for the 4 properties. It is too late for Fred Sr. to complain that he did not offer evidence of the shallowness of his pockets and he cannot shift the burden of having to prove the depth of his financial reservoir to the [counterclaimants]."

We note that in the instant case the trial justice was the fact-finder, and there is no indication in the record that he was susceptible to "passion and prejudice." Reccko v. Criss Cadillac Co., 610 A.2d 542, 546 (R.I. 1992) (internal quotation marks omitted); see also Exemplary Damages in the Law of Torts, 70 Harv. L. Rev. at 530 ("[A] judge has wider

experience with wrongdoers [than a jury] and is familiar with the normal scope and size of awards. The flexibility which exemplary damages bring to the admonitory function of tort law can better be achieved by the judge than by the jury."). Additionally, determinations of credibility and the weight of the evidence are left to the fact-finder and we will not disturb the trial justice's findings when there is no convincing evidence that he abused his discretion. See State v. Paola, 59 A.3d 99, 104 (R.I. 2013) ("[A] trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.") (internal quotation marks omitted); see also Cahill, 11 A.3d at 86. After a thorough review of the evidence that Frederick Sr. alleges was misconceived by the trial justice, we can perceive nothing that would lead us to conclude that the trial justice misconceived the evidence or abused his discretion[29] in: (1) finding that Frederick Sr. was able to pay punitive damages; and (2) proceeding to assess punitive damages against him.

### ii. The Amount of Punitive Damages

Frederick Sr. also argues that the punitive damages award was excessive. He notes that this Court has, in the past, reduced such awards, and he contends that the punitive damages award in the instant case was disproportionate to the compensatory damages award because, he argues (as the counterclaim defendants argued with respect to the compensatory damages), the counterclaimants in the instant case suffered no damages. Accordingly, it is Frederick Sr.'s argument that the punitive damages awarded in this case "shock[] the conscience and should be struck down in [their] entirety * * * ." He further avers that, even if this Court upholds the

---

[29]     Frederick Sr. relies heavily on his own testimony in support of his argument that the trial justice misconceived the evidence when finding that he was able to pay punitive damages. We remind the reader, however, that the trial justice found Frederick Sr.'s testimony to largely lack credibility; in fact he held that much of it was a "knowing fabrication." That determination is entitled to deference on our part. See Cahill v. Morrow, 11 A.3d 82, 86 (R.I. 2011).

compensatory damages award (which we have done), the punitive damages are still excessive. The counterclaimants, in response, claim that there is not so great a discrepancy between the compensatory damages and the punitive damages in this case as to "shock the conscience."

Mindful of the fact that "[p]unitive damages are imprecise and elusive of review," we have held that a jury award of punitive damages (or in this case the award by a trial justice) may be "set aside * * * if the amount clearly appears to be excessive," "shocks the conscience" or appears to represent "passion and prejudice" rather than an "unbiased judgment." Zarrella v. Robinson, 460 A.2d 415, 418 (R.I. 1983); Cady v. IMC Mortgage Co., 862 A.2d 202, 220 (R.I. 2004) (internal quotation marks omitted); Minutelli v. Boranian, 668 A.2d 317, 319 (R.I. 1995) (internal quotation marks omitted). We bear constantly in mind the importance of the fact that the trial justice is in a better position than this Court to assess the testimony of the witnesses and determine credibility, and we "do not lightly disagree with the findings of the trial justice on the matter of * * * punitive damages." Minutelli, 668 A.2d at 319. Nevertheless, we consider the $845,000 punitive damages award to be excessive. It is our judgment that, if we reduce the punitive damages award by half, it is still "adequate to punish" Frederick Sr. and deter future misuse of notices of lis pendens. Id.; see DeLeo, 546 A.2d at 1348 (affirming the decision of a trial justice to reduce a jury's punitive damages award from $75,000 to $30,000 because the award was "grossly excessive" and "such an amount was not needed to deter [the individuals involved in the case] or others from conducting themselves similarly in the future") (internal quotation marks omitted); see also Reccko, 610 A.2d at 546 (reducing a punitive damages award of $50,000 to $25,000). Accordingly, we hold that Frederick Sr. is liable for $422,500 in punitive damages.

## C

### Slander of Title—Frederick Sr.'s Living Children

The final argument with which we must deal is the assertion by the counterclaim defendants that, due to the fact that Frederick Sr.'s living children were not parties to the instant case at the time the notices of lis pendens were filed, it was error for the trial justice to find them liable for slander of title.[30]  In our judgment the question of whether Frederick Sr.'s living children were properly held to be liable for slander of title is a question of law, which we shall review in a de novo manner.  See Gianquitti, 22 A.3d at 1165.

The counterclaim defendants find fault specifically with the trial justice's reliance on Rule 15(c) of the Superior Court Rules of Civil Procedure; it is their contention that the "relation-back doctrine" under Rule 15 applies only to complaints, not to notices of lis pendens. Moreover, the counterclaim defendants aver that the trial justice inappropriately imputed Frederick Sr.'s malice to his children; they contend that such an imputation is appropriate only where there is an agency relationship, and they note that no such relationship exists in the instant case.  Accordingly, the counterclaim defendants contend that the trial justice's decision holding the living children liable for slander of title was erroneous as a matter of law.

Conversely, the counterclaimants urge us to affirm the trial justice's holding that Phillip, Freida, and Laurie are liable for slander of title.  They contend that the siblings "affirmatively embraced" the notices of lis pendens.  As the counterclaimants point out, Phillip joined the suit "voluntarily" and Freida and Laurie had many courses of action available to them, which they chose not to pursue: for example, according to the counterclaimants, Freida and Laurie "could

---

[30]  All of Frederick Sr.'s living children became parties to this case after the notices of lis pendens were filed.  The trial justice determined that Phillip "voluntarily" joined the case, whereas Freida and Laurie were joined as necessary parties.

have declined to join the suit," "renounced any interest in * * * the properties," assigned their interest to Frederick Sr., or contended that they were misled by Frederick Sr.'s assertions and thus had a good faith belief that they had an interest in the properties. In further support of their argument, the counterclaimants point to the fact that, at a later point in the proceedings below, Phillip, Freida, and Laurie objected to the quashing of the notices of lis pendens. The counterclaimants assert that Phillip, Freida, and Laurie knew what they stood to gain should they prevail and what Angela Giguere and Christine Giguere-Carrozza stood to lose; the counterclaimants note that, even knowing what Angela Giguere and Christine Giguere-Carrozza stood to lose, the siblings made no attempt to differentiate their interest in the properties from the interest their father was asserting when he filed the notices of lis pendens.

The trial justice commenced his discussion with respect to the liability of Frederick Sr.'s living children by addressing Phillip's liability; he stated that Phillip had voluntarily joined the action and that, as an attorney himself, he "would certainly have understood the significance of joining" the case as a plaintiff. The trial justice proceeded in his reasoning to note that all three of the siblings were charged with knowledge of the public records—including the fact that Frederick Jr. had held title to the four properties at issue at the time of his death "as well as the original lis pendens filed by [Frederick Sr.] * * * ." With regard to his reasoning for holding the living children liable for slander of title the trial justice stated, in pertinent part, as follows:

> "They could have filed their own amended lis pendens, limiting their claims to the condominium unit and Post Road properties but chose not to. By failing to opt out or renounce, they clearly stood with their hands outstretched, waiting for a decision of this [c]ourt that would place [Frederick Jr.'s] property in those outstretched hands. * * * [O]nce made parties they are not unwilling participants in the lawsuit. They are charged with the knowledge of what was claimed in the complaint. They knew what they were asking for as a matter of law and in fact, they knew what they would gain if they prevailed. They knew what the widow and

- 42 -

adopted child stood to lose and they knew as a matter of law how the properties they were asking to be awarded to them were being held hostage for them by the filing of the lis pendens.

\* \* \*

"Although the lis pendens were filed before they joined the action, under Rule 15(c) the amended complaint relates back to the date of the original pleading, including the filing of the lis pendens. Phillip, Lori [sic] and Freida are charged with filing the lis pendens as if they had filed it themselves. \* \* \* Clearly, if they prevailed they would be expected to participate in whatever benefits that would be derived from the prosecution of this lawsuit."

In accordance with the well-articulated and thorough analysis conducted by the trial justice, it is our judgment that the argument of the counterclaim defendants, which they concisely sum up in their contention that "the trial justice visited the sins of the father upon the children," is unavailing.

We commence our analysis by addressing the trial justice's reliance on Rule 15(c) to relate the "First Amended Miscellaneous Petition" (filed by Frederick Sr.), which joined the siblings as plaintiffs, back to the original "Miscellaneous Petition to Impose Trust."[31] The counterclaim defendants argue that the trial justice's reliance on Rule 15, in the above-quoted text of his bench decision, was in error. Rule 15(c) is entitled "Relation Back of Amendments" and provides in pertinent part as follows:

---

[31] We reiterate that the parties in this case entered into a stipulation with respect to the joining of Phillip, Freida, and Laurie, which was read into the record at the slander of title trial. It provided as follows:

"The pleadings in the [c]ourt record show the following sequence of events that led to the addition of Phillip Carrozza, Laurie Carrozza, Freida Carrozza as party plaintiffs. One [Frederick Sr.] moved to add Phillip Carrozza as a party. Two, [the counterclaimants] objected and stated a joinder should include all of the children. Three, [Frederick Sr.] objected to the addition of Laurie and Freida Carrozza. Four, after a hearing, Justice Fortunato granted [the counterclaimants'] motion, and all of the children were required to be added as plaintiffs."

- 43 -

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing or adding a plaintiff or defendant or the naming of a party relates back if the foregoing provision is satisfied and, within the period provided by Rule 4(1) for service of the summons and complaint, the party against whom the amendment adds a plaintiff, or the added defendant (1) has received such notice of the institution of the action that the party would not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that but for a mistake the action would have been brought by or against the plaintiff or defendant to be added." (Emphasis added.)[32]

---

[32] It is worth noting that, prior to being amended in 2006, Rule 15(c) stated in pertinent part that "[a]n amendment changing the party or the naming of the party against whom a claim is asserted relates back if the foregoing provision is satisfied * * * ." (Emphasis added.) Applying that language, this Court had held that Rule 15(c) allowed relation back to the original complaint only when defendants were added in an amended complaint, but not when additional plaintiffs were added. See, e.g., Balletta v. McHale, 823 A.2d 292, 294-95 (R.I. 2003). Rule 15(c) was amended to remove that restriction. The Committee Notes to the 2006 amendment to Rule 15(c) state as follows:

"The second sentence of Rule 15(c), relative to changing a party 'against whom a claim is asserted' provides that, subject to certain requirements, such amendment relates back. The provision was based on what became a 1966 amendment to Federal Rule 15(c).

"In Balletta v. McHale, 823 A.2d 292 (R.I. 2003), the Supreme Court of Rhode Island applied the sentence literally to include only added defendants. The court rejected relation back of an amendment adding a spouse's claim of loss of consortium to a personal injury action. Addition of a party asserting a claim is not within the language of this second sentence. The advisory committee note to the Federal Rule change, however, indicates that this had not been a problem, that such amendments had been allowed to relate back under the first sentence of Rule 15(c). The reporter's note to Super. R. Civ. P. 15(c) makes the same point. The present proposal is designed to restore that understanding."

The Committee Notes make it clear that Rule 15(c) was intended to allow relation back of a plaintiff added in an amended complaint. That amendment to the Rule provides further reinforcement of the trial justice's holding in the instant case that Phillip, Freida, and Laurie's

The plain language of the rule makes it clear that it is perfectly appropriate for a trial justice to find that plaintiffs who were joined in an amended complaint relate back to the original complaint if the claim asserted in the amended pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Cf. State v. Graff, 17 A.3d 1005, 1010 (R.I. 2011) ("[W]e have indicated that a clear and unambiguous statute will be literally construed.") (internal quotation marks omitted); Fleet National Bank v. Clark, 714 A.2d 1172, 1177 (R.I. 1998) ("If the language is clear on its face, then the plain meaning of the statute must be given effect and this Court should not look elsewhere to discern the legislative intent.") (internal quotation marks omitted). The counterclaim defendants contend that, even given the language of the rule, it is not intended to apply to a notice of lis pendens and that, accordingly, it was inappropriate for the trial justice to attribute Frederick Sr.'s malice at the time of filing the original complaint and the notices of lis pendens to his children. However, the counterclaim defendants have cited to nothing which definitively excludes lis pendens from the application of Rule 15(c). Moreover, even if we were to accept the counterclaim defendants' contention that the trial justice was in error when he relied on Rule 15(c), it is nonetheless our judgment that the trial justice's ultimate conclusion that Phillip, Freida, and Laurie are liable for slander of title was correct because, as the trial justice suggested, Phillip, Freida, and Laurie adopted the notices of lis pendens through their own actions (or lack of action) subsequent to being joined as plaintiffs in the case.[33]

_____

joinder in the "First Amended Miscellaneous Petition" related back to the filing of the "Miscellaneous Petition to Impose Trust."

[33] The counterclaim defendants contend that the trial justice imputed Frederick Sr.'s malice on to his children, which would only be appropriate when there is an agency relationship. However, after a review of the trial justice's reasoning, we do not perceive any indication that he imputed Frederick Sr.'s malice to his living children. Rather, he found that the living children had adopted the notices of lis pendens based on their actions after joining the case. Those

After an extensive and intensive review of the record, we are in agreement with the counterclaimants that "the record is clear, [that Phillip, Freida, and Laurie] affirmatively embraced the Lis Pendens and the consequences that followed therefrom." Although the trial justice found that Freida and Laurie were not joined voluntarily, all the siblings could have renounced an interest in the properties at issue. Instead, they chose to remain as plaintiffs in the civil action and, by staying in the suit, they claimed that they had an interest in the properties at issue, despite (1) their knowledge that the title to all of the properties was in Frederick Jr.'s name, and (2) the clear lack of any evidence, as found by the trial justice, sufficient to show that Frederick Sr. had contributed to the purchase price of the properties.

From the outset and even to this day, the surviving siblings have never renounced or denounced the notices of lis pendens filed by Frederick Sr.[34] In fact, in "Plaintiffs' Objection to

_____

actions, coupled with the siblings' knowledge of the facts which formed the basis of their claim, were sufficient to support a finding that they also acted with malice. Therefore, the counterclaim defendants' agency argument does not change our conclusion that the trial justice was correct in holding Phillip, Freida, and Laurie liable for slander of title.

[34]    In the "Defendants' Answer to Plaintiffs' First Amended Miscellaneous Petition and Counterclaim" filed by the counterclaimants (defendants in the proceedings below) they alleged that:

> "Plaintiffs Philip Carrozza, Freida Carrozza and Laurie Carrozza-Con [sic] have by First Amended Miscellaneous Petition, joined plaintiff Frederick Carrozza Sr., have adopted the aforesaid Notices of Lis Pendens as their own and with said Frederick Carrozza Sr., claim both legal and equitable ownership interest in the aforesaid parcels of real property."

In the "Reply to Amended Counterclaim" the counterclaim defendants (plaintiffs below) responded as follows:

> "At this stage, petitioner does not have sufficient information or belief to form a response to the allegation and neither admits nor denies and petitioner leaves defendants to their proofs. Further, Philip Carrozza voluntarily has moved to join in the matter

- 46 -

Defendants' Motion to Quash and Remove Lis Pendens" (Objection) the counterclaim defendants, including Phillip, Freida, and Laurie, stated, in the course of objecting to the motion to quash, that they "ha[d] an absolute right to maintain the recorded lis pendens and claim ownership or an equitable interest in the properties until and unless a final judgment enters." We view those words as constituting an admission by the living children that they were adopting the notices of <u>lis</u> <u>pendens</u>. Moreover, the Objection makes it clear that the siblings were willing participants in the lawsuit and expected to benefit if the counterclaim defendants won. On the basis of that fact, coupled with the knowledge which we infer the siblings had that title to all of the properties at issue was in the name of their brother, not their father, and that the notices of <u>lis</u> <u>pendens</u> effectively made the properties unmarketable, it is our conclusion that they "affirmatively embraced" the notices of <u>lis</u> <u>pendens</u> and thereby had the malice necessary to support a finding that they slandered the title of those properties.

---

whereas Laurie Carrozza-Conn and Freida Carrozza were compelled and ordered to be joined in the matter by defendant's motion to compel. It is unclear what interest or position they will assert at this point."

While, the counterclaimants are correct that the response of the counterclaim defendants was not an unequivocal denial, we recognize that under Rule 8(b) of the Superior Court Rules of Civil Procedure, a response stating that "the party is without knowledge or information sufficient to form a belief as to the truth of an averment" has the effect of a denial. This Court also recognizes that, in that same filing, the counterclaim defendants expressly denied that: (1) "[t]he aforesaid Notices of Lis Pendens constitute malicious utterances of false statements concerning the defendants' title to the subject properties;" and (2) "[t]he false statements uttered by plaintiff Frederick Carrozza Sr. and adopted by plaintiffs Philip Carrozza, Laurie Carrozza-Conn and Freida Carrozza were made with knowledge of the falsity thereof, with the intent to injure the defendants and to cause the subject properties to be unmarketable." However, these denials reflect only the belief of the siblings that the filing of the notices of <u>lis</u> <u>pendens</u> by their father was not malicious; they did not expressly deny having adopted or, as the counterclaimants put it, "affirmatively embraced" the notices of <u>lis</u> <u>pendens</u>.

We further conclude that the trial justice's metaphorical observation that the siblings were standing "with their hands outstretched, waiting for a decision * * * that would place [Frederick Jr.'s] property in those outstretched hands" was certainly not erroneous. There were options available to Phillip, Freida, and Laurie whereby they could have sought to distance themselves from the notices of lis pendens. As the counterclaimants point out, the siblings could have renounced any interest in the properties at issue; they could have continued to litigate while having allowed the notices of lis pendens to be quashed without objection. Additionally, they could have argued that they were misled by the false assertions of Frederick Sr. and, as a result, could not be found to have had the required malice for a slander of title claim because they had an honest belief that they possessed an interest in the properties. See Peckham, 570 A.2d at 667. They did none of those things. For that reason and the other reasons we have discussed supra, we uphold the ruling of the trial justice that Phillip, Freida, and Laurie are liable, along with their father, for slandering the title to the four properties at issue in this case.

In conclusion, it is our judgment that: (1) the trial justice did not commit clear error or misconceive or overlook material evidence when he held Frederick Sr. liable for slander of title; (2) the trial justice properly computed compensatory damages by subtracting the value of the property on the date the notices of lis pendens were removed from the highest value of the properties attained during the time period in which they were subject to the notices of lis pendens (which occurred in 2005); (3) prejudgment interest should be calculated starting from November 15, 2002, the date of the filing of the notices of lis pendens; (4) the trial justice did not misconceive any material evidence in awarding punitive damages against Frederick Sr., but those punitive damages shall be reduced to $422,500; and (5) the trial justice properly found Phillip, Freida, and Laurie liable for slander of title.

# V

## Conclusion

We affirm the judgment of the Superior Court in all respects except that part of the judgment awarding $845,000 in punitive damages, which we vacate. We hold that the award of punitive damages should be reduced to $422,500, and we remand the record in this case to the Superior Court with instructions that it enter judgment in accordance with this opinion.

Justice Flaherty did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    Frederick Carrozza, Sr., et al. v. Michael Voccola, in his capacity as executor of the Estate of Frederick Carrozza, Jr., et al.

**CASE NO:**    No. 2011-132-Appeal.
(NM 02-603)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    May 16, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice William P. Robinson, III

**SOURCE OF APPEAL:**    Newport County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Stephen P. Nugent

**ATTORNEYS ON APPEAL:**

    For Plaintiffs:  Lauren E. Jones, Esq.

    For Defendants:  Alan I. Baron, Pro Hac Vice